# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

DOXA ENTERPRISES, LTD., d/b/a BORN AGAIN USED BOOKS,

*Plaintiff-Appellant,*

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division; SERGIO RAUDEL CORDOVA, GETA ASFAW, MAYUKO FIEWEGER, DANIEL S. WARD, JADE ROSE KELLY, and ERIC ARTIS, in their official capacities as members of the Colorado Civil Rights Commission; PHIL WEISER, in his official capacity as Colorado Attorney General,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:25-cv-02177 / Hon. Regina M. Rodriguez

## OPENING BRIEF OF APPELLANT
### Oral Argument Requested

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Jonathan A. Scruggs
Henry W. Frampton, IV
Mercer Martin
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org
mmartin@ADFlegal.org

Christopher P. Schandevel
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cschandevel@ADFlegal.org

*Counsel for Appellant*

# TABLE OF CONTENTS

Table of Authorities.................................................................iv

Statement of Related Cases ...................................................1

Statement of Jurisdiction......................................................1

Statement of the Issues.........................................................2

Introduction...........................................................................3

Statement of the Case ...........................................................4

    A.    As a Christian bookstore, Born Again Used Books cannot refer to customers using biologically incorrect pronouns, titles, or other language.......................................4

    B.    Colorado amends its Anti-Discrimination Act so that gender expression now includes use of chosen names and how an individual chooses to be addressed. ....................7

    C.    Fearing enforcement based on its planned statements and its use of biologically correct terms to refer to transgender-identifying customers, Born Again sues..........11

    D.    Director Sullivan concedes past enforcement and potential future enforcement against Born Again. ..............16

    E.    Colorado's proposed expert confirms that not using someone's name and pronouns makes them feel insulted, rejected, unwelcome, and like they might not even be served. ...................................................................20

    F.    The district court denies a preliminary-injunction motion, finding no credible threat of enforcement. ..............21

Standard of Review ..............................................................24

Summary of Argument.........................................................26

Argument..............................................................................28

I.    Born Again does not seek a disfavored injunction—an injunction merely would preserve the status quo between the parties. ...................................................................28

II.   Born Again faces a credible threat of enforcement. .......................31

      A.    Far from disavowing, Colorado repeatedly conceded enforcement against Born Again is possible, and the company shouldn't have to bet the farm to find out.............33

      B.    Colorado's claim that Born Again's written policy and blog post don't violate Colorado's atextual reading of the Act doesn't negate the threat even as to them. .....................37

      C.    Colorado has enforced CADA against nearly identical conduct: an entity's decision to label a person who identifies as "female" as "male" in its internal system. .......39

      D.    The existence of a non-moribund statute, combined with Colorado's failure to disavow, proves the threat. .................41

      E.    The ability of private parties to initiate enforcement proceedings confirms that the threat is imminent and credible. ...................................................................42

III.  Born Again is entitled to a preliminary injunction to prevent enforcement while the case proceeds, and this Court should direct the district court to grant that relief. ...................................45

      A.    The challenged provisions compel and restrict Born Again's speech based on content and viewpoint, and they fail strict scrutiny. ...............................................................46

      B.    The challenged definitions and the Unwelcome Clauses are also vague and overbroad. .............................................49

      C.    The remaining factors favor an injunction. ...........................51

Conclusion .................................................................................52

Statement Regarding Oral Argument ................................................53

Certificate of Compliance .........................................................................54

Certificate of Digital Submission...........................................................55

Certificate of Service ..............................................................................56

Order Adopting Magistrate Judge's Recommendation

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
6 F.4th 1160 (10th Cir. 2021)....................................................25, 45

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ................................... 10, 25, 34, 42, 43, 46, 47

*Aptive Environmental, LLC v. Town of Castle Rock,*
959 F.3d 961 (10th Cir. 2020) ......................................................24

*Armstrong v. District of Columbia Public Library,*
154 F. Supp. 2d 67 (D.D.C. 2001)...............................................50

*Arnold v. Anton Cooperative Association,*
293 P.3d 99 (Colo. App. 2011) ....................................................11

*Awad v. Ziriax,*
670 F.3d 1111 (10th Cir. 2012) ...................................................51

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963) ......................................................................50

*Bauer v. Shepard,*
620 F.3d 704 (7th Cir. 2010) .......................................................42

*Baur v. Veneman,*
352 F.3d 625 (2d Cir. 2003)..........................................................13

*Brush & Nib Studio, LC v. City of Phoenix,*
448 P.3d 890 (Ariz. 2019) ............................................................50

*Brush & Nib Studio, LC v. City of Phoenix,*
418 P.3d 426 (Ariz. Ct. App. 2018)...............................................50

*Bryant v. Woodall,*
1 F.4th 280 (4th Cir. 2021)...........................................................33

*Chiles v. Salazar,*
116 F.4th 1178 (10th Cir. 2024)....................................................37

*Chiles v. Salazar,*
     146 S. Ct. 1010 (2026) ...................................................................37, 48

*Citizens for Responsible Government State Political Action*
     *Committee v. Davidson,*
     236 F.3d 1174 (10th Cir. 2000) .....................................................39

*City & County of San Francisco v. Trump,*
     897 F.3d 1225 (9th Cir. 2018) ......................................................36

*City of Boerne v. Flores,*
     521 U.S. 507 (1997) ......................................................................48

*City of Chicago v. Morales,*
     527 U.S. 41 (1999) ........................................................................49

*Coates v. City of Cincinnati*
     402 U.S. 611 (1971) ......................................................................50

*Courthouse News Service v. New Mexico Administrative Office of*
     *Courts,*
     53 F.4th 1245 (10th Cir. 2022) .....................................................25

*F.C.C. v. Fox Television Stations, Inc.,*
     567 U.S. 239 (2012) ......................................................................49

*FEC v. Wisconsin Right to Life, Inc.,*
     551 U.S. 449 (2007) ......................................................................48

*Fulton v. City of Philadelphia,*
     593 U.S. 522 (2021) ......................................................................48

*Hedges v. Obama,*
     724 F.3d 170 (2d Cir. 2013) .........................................................42

*Heideman v. South Salt Lake City,*
     348 F.3d 1182 (10th Cir. 2003) .....................................................51

*Hobby Lobby Stores, Inc. v. Sebelius,*
     723 F.3d 1114 (10th Cir. 2013) .....................................................45

*Iancu v. Brunetti,*
588 U.S. 388 (2019) ...................................................................48

*Institute for Free Speech v. Johnson,*
148 F.4th 318 (5th Cir. 2025)...................................................36

*Janus v. American Federation of State, County & Municipal Employees, Council 31,*
585 U.S. 878 (2018) ...................................................................46

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ...................................................................24

*Masterpiece Cakeshop v. Colorado Civil Rights Commission,*
584 U.S. 617 (2018) ........................................................... 10, 35

*Matal v. Tam,*
582 U.S. 218 (2017) ...................................................................48

*MedImmune, Inc. v. Genentech, Inc.,*
549 U.S. 118 (2007) ...................................................................33

*Meriwether v. Hartop,*
992 F.3d 492 (6th Cir. 2021) .....................................................46

*New Hampshire Right to Life Political Action Committee v. Gardner,*
99 F.3d 8 (1st Cir. 1996)............................................................42

*North Carolina Right to Life, Inc. v. Bartlett,*
168 F.3d 705 (4th Cir. 1999) ...........................................38, 39, 42

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,*
389 F.3d 973 (10th Cir. 2004) .........................................28, 29, 30

*Peck v. McCann,*
43 F.4th 1116 (10th Cir. 2022)...............................25, 26, 31, 37

*Riley v. National Federation of the Blind of North Carolina,*
487 U.S. 781 (1988) ...................................................................47

*Rio Grande Foundation v. Oliver,*
  57 F.4th 1147 (10th Cir. 2023)........................................24

*Rocky Mountain Gun Owners v. Polis,*
  121 F.4th 96 (10th Cir. 2024)............................ 24, 25, 33

*Rosenberger v. Rector & Visitors of University of Virginia,*
  515 U.S. 819 (1995) ....................................................48

*Sanchez v. Torrez,*
  173 F.4th 1202 (10th Cir. 2026)................... 32, 33, 34, 36

*Saxe v. State College Area School District,*
  240 F.3d 200 (3d Cir. 2001).........................................50

*SCFC ILC, Inc. v. Visa USA, Inc.,*
  936 F.2d 1096 (10th Cir. 1991) ...............................28, 29

*Scott v. Allen,*
  153 F.4th 1088 (10th Cir. 2025).................................32

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ...............................................32, 43

*Virginia v. American Booksellers Association, Inc.,*
  484 U.S. 383 (1988) ....................................................36

*Vitagliano v. County of Westchester,*
  71 F.4th 130 (2d Cir. 2023) .........................................41

*Westar Energy, Inc. v. Lake,*
  552 F.3d 1215 (10th Cir. 2009) ...................................45

*Wooley v. Maynard,*
  430 U.S. 705 (1977) ....................................................46

*Wyatt Bury, LLC v. City of Kansas City,*
  804 F. Supp. 3d 939 (W.D. Mo. 2025) .........................35

*Wyoming Gun Owners v. Gray,*
  83 F.4th 1224 (10th Cir. 2023)...................................49

## Statutes

28 U.S.C. § 1292 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1343 ...............................................................................1

28 U.S.C. § 2107(a) ..........................................................................1

42 U.S.C. § 1983 ...............................................................................1

Colo. Rev. Stat. § 18-1.3-501 .........................................................11

Colo. Rev. Stat. § 24-34-301 .................................... 7, 8, 38, 39, 46

Colo. Rev. Stat. § 24-34-306 ...................................... 9, 10, 11, 43

Colo. Rev. Stat. § 24-34-600.3 ............................................... 7, 11

Colo. Rev. Stat. § 24-34-601 ............................................... 8, 9, 50

Colo. Rev. Stat. § 24-34-602 ...........................................................11

Colo. Rev. Stat. § 24-34-605 ...........................................................10

Colo. Rev. Stat. § 24-34-701 ................................... 7, 8, 9, 11, 50

Colo. Rev. Stat. § 24-34-705 ...........................................................11

## Other Authorities

Elizabeth Sepper, *The Original Meaning of "Full and Equal Enjoyment" of Public Accommodations*, 11 Cal. L. Rev. Online 572 (2021) ...........................................................35

## Rules

Federal Rule of Appellate Procedure 4 .......................................1

## Regulations

3 Colo. Code Regs. § 708-1:81.6.............................................22, 28

## STATEMENT OF RELATED CASES

By order dated April 28, 2026, this Court partially procedurally consolidated this appeal with two related appeals challenging the same district-court order: *Born Again a/k/a/ Committee of Five, Inc. v. Sullivan, et al.*, Appeal No. 26-1103, and *Defending Education, et al. v. Sullivan, et al.*, Appeal No. 26-1101.

## STATEMENT OF JURISDICTION

Doxa Enterprises, Ltd., doing business as Born Again Used Books, sued Colorado officials Aubrey C. Sullivan, in her official capacity as Director of the Colorado Civil Rights Division; Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade Rose Kelly, and Eric Artis, in their official capacities as members of the Colorado Civil Rights Commission; and Phil Weiser, in his official capacity as Colorado Attorney General, in the United States District Court for the District of Colorado under 42 U.S.C. § 1983, alleging violations of Born Again's rights under the First and Fourteenth Amendments to the United States Constitution. The district court properly exercised federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

On March 31, 2026, the district court denied Born Again's motion for a preliminary injunction. Born Again timely filed its notice of appeal on April 2, 2026, within the 30-day period established in 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Is Born Again seeking a disfavored injunction that would disrupt the status quo when the injunction would merely prevent enforcement while the case proceeds below? 2.App.320–22;[1] 3.App.800.

2. Does Born Again likely have pre-enforcement standing to challenge provisions of the Colorado Anti-Discrimination Act that prohibit discrimination based on gender expression—defined to include chosen names and how someone chooses to be addressed—when Born Again refuses to use chosen names and biologically incorrect terms, actively uses biologically correct terms, and is chilling its speech to avoid enforcement? 1App.90–92; 2.App.294–315; 3.App.794, 803–09.

3. Is Born Again entitled to a preliminary injunction because certain provisions of the Colorado Anti-Discrimination Act likely violate its First Amendment right to free speech and its Fourteenth Amendment right not to have its speech restricted by unconstitutionally vague and overbroad statutes? 1.App.93–109; 2.App.320–26; 3.App.809–10.

---

[1] Consistent with Circuit Rule 28.1(A)(1), references to the Appellant's Appendix are by volume and page number, following this convention: [volume number].App.[page number(s)].

References to the Sealed Appendix filed in the partially consolidated appeal, *Defending Education, et al. v. Sullivan, et al.*, Appeal No. 26-1101, follow this convention: *DE*.6.Sealed.App.[page number(s)]. All the sealed materials cited in this brief can also be accessed in the sealed appendix filed in the district court in this case at Docket No. 47.

**INTRODUCTION**

Born Again Used Books cannot call a man a woman. And it cannot call a woman a man. Its Christian owners believe God made every person male or female. So when employees greet customers or hand them off to coworkers, they use titles, pronouns, and other biologically correct terms to endorse God's design for human sexuality.

Colorado now forbids that message. The State broadened its Anti-Discrimination Act to define "gender expression" to include a person's "chosen name" and "how the individual chooses to be addressed." That change swept the bookstore's everyday speech into six of the Act's provisions. Born Again has chilled its speech ever since. To do otherwise could trigger fines, a misdemeanor charge, and a burdensome administrative process anyone in the State can start with a single complaint.

Born Again sued in hopes of speaking freely again. It asked only to keep speaking as it always has, without fear of punishment, while the case proceeds. The district court refused. It held that Born Again sought a disfavored injunction and faced no credible threat of enforcement—even though Colorado never disavowed enforcing the Act against the bookstore, found probable cause against a business for nearly identical conduct, and conceded repeatedly that Born Again's speech could violate the law.

All of that is error. The threat Born Again faces is real, credible, and imminent. This Court should reverse.

3

## STATEMENT OF THE CASE

### A. As a Christian bookstore, Born Again Used Books cannot refer to customers using biologically incorrect pronouns, titles, or other language.

Born Again Used Books is a distinctly Christian, brick-and-mortar used bookstore operating in Colorado Springs, Colorado. Eric Smith and his wife Sara purchased the bookstore in 2020. Eric is a pastor at a local church, and the Smiths run the bookstore consistently with their religious beliefs. 1.App.25. The bookstore mainly sells Christian books, homeschool materials, and classic literature, but it also sells some secular nonfiction titles, like biographies and history books. 1.App.25–26.

The name "Born Again" carries a double meaning, referring both to the bookstore's used-book offerings and its Christian mission, which is to provide literature that supports customers in their relationships with God and others. 1.App.27. All Born Again's employees are Christians. 1.App.29. And Born Again encourages its employees to express Christian virtue and kindness to its customers. *Id.* As a result of its mission and the Christian content of most of its books, Born Again's employees frequently discuss matters of faith with customers, even frequently praying with customers in the store. *Id.*; 2.App.367. Unlike many retail stores, Born Again prioritizes interacting with customers and engaging with them in deeper conversations, and the bookstore intentionally hires employees who are very conversational and personable with customers. 2.App.367.

Through its events and daily interactions with customers, Born Again's owner and employees interact weekly with hundreds of people from diverse backgrounds. 1.App.29. Many of Born Again's customers seek the bookstore out because they appreciate its religious mission, supportive environment, and Christian offerings. *Id.* But some people visit the bookstore unaware of its Christian mission, and when they learn about Born Again's mission and religious beliefs and practices, some customers leave the store upset. 1.App.30.

For those who stay, Born Again serves every customer regardless of their race, religion, sex, sexual orientation, gender expression, or any other status. 1.App.31. Born Again believes every person is created in God's image and deserves to be treated with dignity and respect, including customers who disagree with the bookstore's Christian beliefs and practices. *Id.*

At the same time, Born Again also believes God created people male and female, and it believes that God's design is that everyone's created biological sex determines whether they are male or female. *Id.* And Born Again cannot deny or contradict these Christian beliefs when it speaks to or serves the public. *Id.* So Born Again cannot use language that affirms someone's identification as the opposite sex. *Id.* To do so would be to affirm "gender choices" that are inconsistent with God's design, leading Born Again to honor something that is not honored by God, which Born Again cannot do. *Id.*

Thus, Born Again "cannot use pronouns, titles, or other language that does not align with an individual's biological sex." 1.App.32, 38. More specifically, it cannot refer to a biological male as "she" or "Ms." or as a "woman." 1.App.32. It cannot refer to a biological female as "he" or "Mr." or a "man." *Id*. And it cannot use any other language "that is not consonant with the individual's biological sex." *Id*. The bookstore believes doing so "would be untruthful, misleading, and would violate the divine commandment not to bear false witness." *Id*. And it also would "promote the idea that sex is mutable rather than biologically fixed, which contradicts its Christian faith and beliefs and is not an idea that [it] can promote in good conscience." *Id*.

By contrast, Born Again "can and regularly does use pronouns, titles, and language that align with the person's biological sex." 1.App.32. Because of the way it interacts with its customers, "gendered language comes up a lot." 2.App.367. That includes a gendered greeting when customers walk in the door, interacting with multiple customers at the same time, and when one employee hands a customer off to another. 2.App.364, 367. For those handoffs, employees "always use pronouns or gendered language." 2.App.364. When asked to use language inconsistent with a customer's biological sex, employees would "respectfully decline and instead intentionally, respectfully, and consis-tently use a form of address that does not contradict the customer's sex, such as the customer's first or last name." 1.App.32, 38; 2.App.367.

Born Again "has served customers who present as transgender, and it is always at risk of receiving a request to use pronouns or titles that would violate the store's religious faith." 1.App.32; 2.App.361–69. And because it "refer[s] to transgender-identifying individuals exclusively with biologically accurate pronouns, titles, and language," it risks being accused of denying them full and equal enjoyment of its goods and services. 1.App.38.

**B. Colorado amends its Anti-Discrimination Act so that gender expression now includes use of chosen names and how an individual chooses to be addressed.**

The Colorado Anti-Discrimination Act, or CADA, regulates "places of public accommodation" in two sections: one focused on discrimination by public accommodations (Colo. Rev. Stat. § 24-34-600.3 *et seq.*), and the other focused on discriminatory advertisements and publications (Colo. Rev. Stat. § 24-34-701, *et seq.*).

Both sections prohibit discrimination based on "[g]ender expression," which, until May 2025, CADA defined as "an individual's way of reflecting and expressing the individual's gender to the outside world, typically demonstrated through appearance, dress, and behavior." Colo. Rev. Stat. § 24-34-301(9) (2024).

In May 2025, though, Colorado amended that provision to also encompass an individual's "chosen name" and "how the individual chooses to be addressed." Colo. Rev. Stat. § 24-34-301(9). In the same

7

amendment, Colorado defined "[c]hosen name" to mean "a name that an individual requests to be known as in connection to the individual's … gender identity [or] gender expression … so long as the name does not contain offensive language and the individual is not requesting the name for frivolous purposes." Colo. Rev. Stat. § 24-34-301(3.5).

Relevant here, these new definitions of "gender expression" and "chosen name" apply to six CADA provisions that implicate public accommodations' speech activities. 1.App.118–19 (collecting provisions).

**1. The Denial Clause** makes it unlawful discrimination for anyone, "directly or indirectly, to refuse, withhold from, or deny to an individual or a group … the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation" because of "gender expression." Colo. Rev. Stat. § 24-34-601(2)(a).

**2. The Publication Clause** prohibits publishing anything that "indicates" a public accommodation will deny "full and equal enjoyment" of its "goods, services, facilities, privileges, advantages, or accommodations" based on "gender expression." Colo. Rev. Stat. § 24-34-601(2)(a).

**3. The Denial Advertisement Clause** prohibits publishing anything that "[s]tates that any of the accommodations, rights, privileges, advantages, or conveniences of the place shall or will be refused, withheld from, or denied" based on "gender expression." Colo. Rev. Stat. § 24-34-701(1)(b).

**4. The Discriminatory Advertisement Clause** prohibits publishing anything that "is intended or calculated to discriminate or actually discriminates against any person or class of persons on account of … gender expression … in the matter of furnishing or neglecting or refusing to furnish … any accommodation, right, privilege, advantage, or convenience offered to or enjoyed by the general public." Colo. Rev. Stat. § 24-34-701(1)(a).

**5. The Unwelcome Clause** prohibits publishing anything that "indicates" that a person's "patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of … gender expression." Colo. Rev. Stat. § 24-34-601(2)(a).

**6. The Unwelcome Advertisement Clause** prohibits publishing anything that "[s]tates that the patronage, custom, presence, [or] frequenting" of a person belonging to "any particular … gender expression" at a place of public accommodation "is unwelcome or objectionable or not acceptable, desired, or solicited." Colo. Rev. Stat. § 24-34-701(1)(c).

Any person "claiming to be aggrieved by a discriminatory or an unfair practice" may file a charge of discrimination with the Colorado Civil Rights Division. Colo. Rev. Stat. § 24-34-306(1)(a)(I). The Attorney General, the Colorado Civil Rights Commission, or a commissioner may also file a charge if they believe a discriminatory practice "imposes a significant societal or community impact." *Id.* § 24-34-306(1)(b).

Once a charge has been filed, an investigatory and administrative process begins in which the Director has broad subpoena authority to "compel the testimony of witnesses and the production of books, papers, and records." Colo. Rev. Stat. § 24-34-306(2)(a). If the Director finds probable cause exists, she "shall order" "compulsory mediation" between the two parties, and she "shall endeavor to eliminate the discriminatory or unfair practice by conference, conciliation, and persuasion and by means of the compulsory mediation." *Id.* § 24-34-306(2)(b)(II).

If those efforts fail, the Director reports the charge to the Commission, potentially triggering a hearing before the Commission or an administrative law judge. Colo. Rev. Stat. § 24-34-306(4). If either determines the respondent engaged in a discriminatory practice, the Commission "may impose remedial measures as provided by statute." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 628 (2018) (citing Colo. Rev. Stat. § 24-34-306(9)). Possible remedies include "orders to cease-and-desist a discriminatory policy, to file regular compliance reports with the Commission, and 'to take affirmative action, including the posting of notices setting forth the substantive rights of the public.'" *Id.* (quoting Colo. Rev. Stat. § 24-34-605). In the past, these actions "have included participation in mandatory educational programs." *303 Creative LLC v. Elenis*, 600 U.S. 570, 581 (2023).

What's more, a person alleging a violation doesn't have to go through the Division at all. Instead, that person can sue directly in a Colorado district court. Colo. Rev. Stat. § 24-34-306(14). If a court finds that a public accommodation violated the public-accommodations clauses (Colo. Rev. Stat. § 24-34-600.3 *et seq.*), it may fine the party $5,000 for *each* violation. *Id.* § 24-34-602.[2] And if it finds that a public accommodation violated the advertisement clauses (Colo. Rev. Stat. § 24-34-701, *et seq.*), it may find the party guilty of a class two misdemeanor, punishable by up to "120 days imprisonment, not more than a seven hundred fifty dollar fine, or both." Colo. Rev. Stat. § 24-34-705; Colo. Rev. Stat. § 18-1.3-501(1)(a.5). The party may also have to pay damages. *See Arnold v. Anton Co-op. Ass'n*, 293 P.3d 99, 104 (Colo. App. 2011).

### C. Fearing enforcement based on its planned statements and its use of biologically correct terms to refer to transgender-identifying customers, Born Again sues.

During a six-month period around the time Colorado passed the amendment to CADA's definition of "gender expression," Born Again's owner and employees had three separate interactions in the bookstore with potential customers who seemingly identified as transgender. 2.App.361, 366.

---

[2] That number was $3,500 when this case began. 1.App.44.

In the first instance, in March 2025, an employee named Nancy helped a teenage customer who appeared to be a boy with long hair. 2.App.361–62. After helping the teenager, Nancy then ran into the teen's parents in a different part of the store and told them, "I just helped your son." 2.App.361. In response, the father told Nancy very clearly and adamantly, "[W]e don't have a son." 2.App.361–62. Nancy interpreted the dad's statement to mean that the child she saw as a boy, "they no longer saw as a boy." 2.App.362.

In the second instance, in May 2025, an employee named Heidi interacted with two female customers "who both seemed to present as males" based on their clothing, jewelry, short hair, and the way they walked and carried themselves. 2.App.362–63. Heidi almost always welcomed people into the store using gendered language like, "[W]elcome in ladies." 2.App.362. But she was "uncertain and kind of nervous about how to address them." *Id.* So she consciously refrained from using any gendered language when she greeted them. 2.App.362–63. "She kind of silenced herself on that." 2.App.363. After entering the bookstore and talking with Heidi some, the two customers looked around for a little bit and then left. *Id.*

In the third instance, in August 2025,[3] the bookstore's owner Eric Smith was working at the store when two young men entered dressed in feminine clothes—blousy tops, matching pants and shorts—carrying purses. 2.App.354, 363–64. One of them had a small beard. 2.App.363. Another employee, Becky, greeted them as they came in. 2.App.364. But she refrained from using a gendered greeting like "Hey guys," or "Hey gentlemen." *Id.*; *accord* 2.App.355. When Eric later approached the two customers, he wanted to say, "[C]an I help you guys find anything?" 2.App.364. But Colorado's recent amendment to CADA "was very much in [his] mind" because it was already in place. *Id.* And Eric was concerned that greeting them that way could trigger a conversation about what pronouns they preferred, which he would not be able to accommodate if their pronouns were inconsistent with their biological sex. 2.App.365. So he refrained from saying that. 2.App.364.

When Eric later handed the two customers off to Becky to help them find a book, his "gut instinct" was to say "these gentlemen" or "these guys are looking for this specific book." *Id.* But again he "refrain[ed] from using gendered language out of fear of what might happen, legally speaking, knowing the law was in place." *Id.* Instead, he

---

[3] "Although a plaintiff's standing is assessed as of the time the lawsuit is brought, post-filing events may confirm that a plaintiff's fear of future harm is reasonable." *Baur v. Veneman*, 352 F.3d 625, 637 n.11 (2d Cir. 2003) (citation modified).

"made a little bit of an awkward handoff." *Id.*; *accord* 2.App.355. The two customers eventually left without purchasing anything. *Id.*

Born Again also has a website and Facebook and Instagram pages, which it uses to interact with customers and share store news. 1.App.22, 27. After the amendment to CADA passed, Born Again wanted to adopt a written policy on its pronoun and gendered-title practice and to publish a blog post on its website explaining its policy "and the Christian beliefs behind it." 1.App.33–34, 65, 67–68. That blog post would link to the bookstore's pronoun policy. 1.App.34, 67. Given news coverage about the amendment, Born Again wants to be transparent "about what it will and will not provide" its customers. 1.App.33.

In its planned blog post, Born Again wants to explain that "truth is inherent in love," and that if "we are to truly love someone, we must share the truth with them." 1.App.67. That's why Born Again cannot call "a person that God created a male 'she', or 'Ms.' or refer[] to him as a 'woman.'" *Id.* And the "same would go for calling a person God created female, 'he,' 'Mr.,' 'Sir,' or referring to her as a 'man.'" *Id.* All of that "would be a lie" and violate the store's Christian beliefs. *Id.*

Born Again also wants to publish other blog posts and social-media content that would "discuss Christian teaching about human sexuality, the creation of human beings as male and female, the immutability of biological sex, and God's design for people to live consistent with their God-given sex." 1.App.34. But the bookstore has

refrained from publicly posting its pronoun policy, its planned blog post, and other blog posts and social-media content "because it fears that doing so would violate" CADA now that the definition of "gender expression" has been amended to include a person's chosen name and how they choose to be addressed. 1.App.39. Born Again "would immediately publish its pronoun policy, pronoun blog post, or some materially similar statements, but for its reasonable fear that it will face prosecution under CADA if it does so." *Id.*; *accord* 2.App.353, 355.

Despite those fears and their chilling effects, Born Again "intends to continue to abide by its pronoun policy and refer to customers with pronouns and titles that match their biological sex." 1.App.45–46. By following that policy, the bookstore "faces the imminent risk of an enforcement proceeding, prosecution, or civil lawsuit under CADA and severe penalties for noncompliance." 1.App.46.

Concerned that the amendment, "Colorado's aggressive enforcement history," and "the ability of anyone to start the enforcement process based solely on what they read online makes the threat of enforcement credible, substantial, and imminent," Born Again filed this pre-enforcement suit in federal court. 1.App.48. The complaint alleged First and Fourteenth Amendment violations and sought both declaratory and injunctive relief. 1.App.50–61. And Born Again subsequently moved for a preliminary injunction to stop Colorado from punishing it for its speech while the litigation proceeded. 1.App.69–71.

**D. Director Sullivan concedes past enforcement and potential future enforcement against Born Again.**

Because Colorado believed "limited jurisdictional and expedited discovery [were] necessary to clarify the Court's jurisdiction and respond to the PI motion," the parties jointly moved for an agreed schedule to conduct that discovery. 1.App.120–22. The motion was granted, and the parties proceeded to take limited discovery. 1.App.10.

During that discovery, Aubrey Sullivan, the Director of the Colorado Civil Rights Division, at first stated in a declaration that, to the best of her knowledge, the Division had "not found probable cause in any public accommodations case based upon a … failure to use an individual's chosen name and/or how the individual chooses to be addressed." 1.App.213. And she added that, again to the best of her knowledge, the Division had only received "two complaints … in which misgendering was part of the alleged discrimination," neither of which resulted in a finding of probable cause. *Id.*

But one month later, Director Sullivan was forced to correct those statements. 2.App.384–85. Based on "additional searches conducted in response to document requests by Plaintiffs," she compiled a chart summarizing 17 cases "involving allegations of misgendering and/or deadnaming against places of public accommodations." *Id.* And in one of those cases, "a finding of probable cause of discrimination was made." 2.App.385.

That case involved a complaint filed against a blood bank by a donor who was biologically male but transitioned to identify as female between the donor's first and second time donating blood. *DE*.6.Sealed.App.10, 27. As a result of that transition, the donor created a new "female" profile. *Id*. But when the blood bank discovered the two accounts, it told the donor the accounts would have to be merged, and the donor's sex would have to remain listed as "male" in its system. *Id*.

When the Division investigated, the blood bank tried to justify labeling the donor as "male" in its system, citing regulations requiring it to ask male donors HIV-screening questions. *DE*.6.Sealed.App.10. The blood bank's system was only set up to prompt those questions if the donor's sex was listed as "male." *Id*. But the blood bank was "working on updating its system to enable it to prompt the question even when a trans woman identifies as 'female.'" *DE*.6.Sealed.App.11.

Even still, the Division found probable cause to believe the blood bank violated CADA by labeling the donor as "male." 3.App.610; *DE*.6.Sealed.App.10. The FDA's revised recommendations let donors self-identify. *DE*.6.Sealed.App.11. So the Division concluded the donor "was not provided equal treatment to donors outside her protected class, because she was not allowed to self-identify her gender in her donor profile." *DE*.6.Sealed.App.144. That made the evidence "sufficient to substantiate a claim of discriminatory denial of full and equal enjoyment of a place of public accommodation." *DE*.6.Sealed.App.144–45.

17

Despite that enforcement history, Colorado insisted it did not have enough facts to say whether it would violate CADA for Born Again to deny a transgender-identifying customer's request for pronouns that matched their gender expression and instead to "knowingly and intentionally refer to the customer with the pronouns inconsistent with the customer's gender expression in the customer's earshot." 2.App.333–35.

Applying a test that is not in the Act's text, 2.App.336–37, Colorado claimed that the Division "would need to consider the full circumstances of the interaction between the customer and the Born Again Books employee to determine whether a reasonable person, under the circumstances experienced by the complainant, [1] would experience the employee's reference to the customer with pronouns inconsistent with the customer's gender expression in the customer's earshot as harassment, and/or [2] would otherwise experience the full course of conduct as denying them full and equal enjoyment of Born Again Books' goods, services, facilities, privileges, advantages, or accommodations based on their gender identity," 2.App.338–39. And the Division could not make any predictions about how it would resolve those questions without more details about "the interaction between the customer and the Born Again Books employee." 2.App.334.

Absent a complainant, the best Colorado could say was that failing to use a customer's preferred pronouns, "standing alone, … does not amount to a *per se* violation of CADA." 2.App.344–45. "However," a

18

public accommodation's "refusal to use a customer's preferred pronouns or chosen name *may impact* that customer's full and equal enjoyment of the goods, services, benefits or privileges offered by the place of public accommodation." 2.App.345 (emphasis added). Whether that impact qualifies as a violation is simply "context-dependent." *Id.*

Given the fact-specific nature of that inquiry, Director Sullivan conceded it's entirely "possible" for intentional "misgendering" to create a "subjectively and objectively hostile environment and rise to the level of harassment," which would violate CADA in the Division's view. 3.App.656. She also conceded it's "possible" that refusing to accommodate an individual's transition or gender expression "would be a denial of an accommodation" under CADA. 3.App.596–98. And failing to use preferred pronouns "could be part of the analysis." 3.App.596–97.

Finally, when Director Sullivan was asked whether it was possible the Division could find there was unlawful harassment "based on one instance of deliberate misgendering to a customer," she replied only that the Division "would need to look at the full circumstances of the interaction." 3.App.654. When asked a second time, she replied that "it would be fact specific and depend on the specific interactions—specific facts of an interaction." 3.App.655. In the Director's view, even a single instance of deliberate "misgendering" could violate CADA so long as "the conduct created an environment that was both subjectively and objectively hostile based on the individual's protected class." 3.App.654.

**E. Colorado's proposed expert confirms that not using someone's name and pronouns makes them feel insulted, rejected, unwelcome, and like they might not even be served.**

To support their opposition to a preliminary injunction, the State Defendants retained Dr. Ilan Meyer to provide expert testimony on how failing "to use a transgender person's 'chosen name and how the individual chooses to be addressed'…impacts [their] health and wellbeing." 1.App.221. In his declaration, Dr. Meyer described the effects of "gender non-affirming interaction[s]," such as when someone intentionally uses "gender pronouns and a name that do not match their gender identity and presentation, for example referring to a transgender woman as 'Sir,' conveying rejection and disapproval of the person." 1.App.235.

In his deposition, Dr. Meyer expanded on how a transgender-identifying person might feel being referred to in biologically correct terms. In general, he thought they'd feel "mistreated, disrespected," "offended," and treated with "a lack of dignity." 2.App.479. They'd feel like they'd suffered "an assault on their sense of … self-identity." *Id*. They'd hear a "message of derision, disrespect, or rejection." 2.App.545. And even if the "misgendering" merely involved two employees talking to each other, it still "would send a message of derision." 2.App.543–44.

Dr. Meyer also opined that a business's refusal to use preferred pronouns would make someone who identifies as transgender "feel unwelcome." 2.App.545. And that would be a "reasonable" response that

"makes sense" "because there's clearly a message that this person or establishment is not respecting them." 2.App.546.

Finally, Dr. Meyer was asked how a transgender-identifying person would experience seeing a big sign in a store that says, "We will only use biologically based pronouns in language. If you were born male, we'll refer to you as 'Mr.' and 'he.' Don't bother asking for other pronouns. We won't use them." 2.App.562. Dr. Meyer answered that a person would interpret that to mean "you're not going to be respected as a transgender person in this environment." 2.App.563. And "moreover, you won't be even served maybe." *Id.*

## F. The district court denies a preliminary-injunction motion, finding no credible threat of enforcement.

After a magistrate judge recommended that the district court deny Born Again's preliminary-injunction motion (together with similar motions in two related cases challenging the same CADA provisions), the district court accepted the magistrate's recommendation and denied all three motions in one order. 3.App.788–811.

Relevant here, the court held that Born Again's "intended conduct—to refer to individuals using pronouns, honorifics, or titles that are consistent with that person's biological sex without denying goods or services—does not appear on its face to violate CADA or present a credible threat of enforcement." 3.App.794.

To get there, the court first held that Born Again was seeking a "disfavored injunction … that would alter the status quo" because, even before the 2025 amendment, a 2009 Commission regulation made it unlawful harassment to "deliberately misus[e] an individual's preferred name, form of address, or gender-related pronoun." 3.App.800 (quoting 3 Colo. Code Regs. § 708-1:81.6(A)(4)). So the court thought an injunction would "disrupt [that] decades-long history." *Id.*

Moving to standing, the court held that Born Again had "failed to demonstrate the elements of credible threat of enforcement to justify pre-enforcement injunctive relief." 3.App.805.

First, starting with whether Colorado had disavowed any intent to enforce CADA against Born Again, the court conceded that it was "true the Defendants have not completely disavowed any possible prosecution of Collective Plaintiffs under any circumstances." 3.App.807. But the court added that "this is not required." *Id.* As the court read the record, the Director had "provided evidence" that she would not take any enforcement actions "under the circumstances presented by Collective Plaintiffs." 3.App.806–07. The Division had not received "any complaints" based on a public accommodation's "policy or publication on misgendering or deadnaming." 3.App.806. And Colorado had provided evidence that "Collective Plaintiffs' intended misgendering and deadnaming alone is not conduct that violates CADA *per se*," so it would have to "rise to the level of harassment to be a violation." *Id.*

Second, on whether Colorado had enforced CADA against the same conduct, the court distinguished the Division's probable-cause finding against the blood bank by simply reiterating the Division's finding: "the complainant 'was not provided equal treatment to donors outside her protected class, because she was not allowed to self-identify her gender in her donor profile.'" 3.App.808 (quoting *DE*.6.Sealed.App.12). As a result, the court reasoned, the complainant was "denied the services" of the public accommodation because of gender identity. *Id.*

And third, on the authority of private parties to initiate charges under CADA, the district court seemed to recognize that this factor weighs in Born Again's favor. 3.App.809. But the court noted that the magistrate judge had "explained that the weight of the other two factors" was "sufficient to find that Collective Plaintiffs have not demonstrated they face a credible threat of enforcement." *Id.* And the court agreed. *Id.*

Finally, the district court briefly assessed whether the remaining preliminary-injunction factors weighed against preliminary relief. 3.App.809–10. On irreparable harm, the "Collective Plaintiffs [had] not demonstrated a credible threat of enforcement" or a "single complaint or history of enforcement tied to the conduct at issue." 3.App.810.

23

And while the court agreed that "the public has an interest in protecting an individual's constitutional rights," the court thought that "alone" could not "overcome Collective Plaintiffs' failure to satisfy their burden of demonstrating that the extraordinary relief of pre-enforcement injunction is appropriate." *Id.* So the court denied the requests for preliminary injunctions in all three cases. *Id.*

The Collective Plaintiffs in all three cases, including Born Again in this case, timely appealed to this Court. 3.App.812–13.

## STANDARD OF REVIEW

This Court reviews district-court rulings on standing de novo. *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 973 (10th Cir. 2020) (citation modified). "It is axiomatic that standing is evaluated as of the time a case is filed." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1161 (10th Cir. 2023). And it "must be substantiated 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024) (*RMGO*) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

"At the preliminary injunction stage, then, the plaintiff must make a clear showing that they are likely to establish each element of standing." *Id.* (citation modified). If discovery has already been conducted, the plaintiff must move beyond "mere allegations … and

provide specific facts, supported by affidavits or other evidence, to demonstrate standing." *Id.* at 108–09 (citation modified). At the same time, "the First Amendment context creates unique interests" that lead the Court to apply "standing requirements somewhat more leniently, facilitating pre-enforcement suits." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022).

Finally, this Court reviews a preliminary-injunction denial for abuse of discretion. *Courthouse News Serv. v. N.M. Admin. Off. of Cts.*, 53 F.4th 1245, 1254 (10th Cir. 2022). "Where the activity in question is arguably protected by the First Amendment, the court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1171 (10th Cir. 2021), *rev'd on other grounds*, 600 U.S. 570 (2023) (citation modified).

## SUMMARY OF ARGUMENT

The district court denied a preliminary injunction on two main grounds. Both fail. And because the parties built a full record below, this Court should reverse and direct entry of the requested injunction.

First, Born Again does not seek a disfavored injunction. The court thought otherwise because a 2009 regulation theoretically let Colorado punish "misgendering" even before the recent amendment. But the status quo turns on the *reality* of the status and relationship between the parties—not their abstract legal rights. And the reality here is that Colorado has not yet enforced CADA against Born Again. And before the recent amendment, Born Again did not feel forced to chill its speech. An injunction would hold that line while the case proceeds below.

Second, Born Again faces a credible threat of enforcement. "[T]his is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Peck*, 43 F.4th at 1133. And three points confirm the threat here: (1) Colorado's refusal to disavow, (2) its enforcement against the same conduct, and (3) the power of any private party to file a charge.

1. Colorado never disavowed enforcement. A defendant's refusal to disavow supplies strong evidence that a threat exists, and Colorado offered only that its choice whether to enforce against Born Again will turn on the facts. That answer gives cold comfort. Born Again should not have to bet the farm just to test the law's validity.

2. Colorado has enforced the Act against nearly identical conduct. It found probable cause against a blood bank that declined to label a biologically male donor as "female" in its own records. If labeling a male donor "male" denies full and equal enjoyment, so does Born Again's refusal to refer to males using female pronouns and honorifics.

3. Anyone aggrieved—even someone who never meant to shop there—may file a complaint against Born Again and start the administrative process. Born Again has already served and interacted with transgender-identifying potential customers in its store. The risk that one of them will file a charge against the bookstore if the bookstore declines to use biologically incorrect language is too imminent to leave Born Again exposed without a preliminary injunction.

On the merits, Colorado barely contests that the challenged provisions compel and restrict speech based on content and viewpoint, and they cannot survive strict scrutiny. Colorado pleads only a broad interest in ending discrimination, and it never shows why muzzling this one bookstore serves that interest when the State can protect equal access by regulating sales instead. The new definitions and the Unwelcome Clauses also fail for vagueness and overbreadth. And the remaining factors—irreparable harm, the balance of equities, and the public interest—all favor relief. This Court should reverse and direct the district court to enter the requested preliminary injunction.

# ARGUMENT

**I.    Born Again does not seek a disfavored injunction—an injunction merely would preserve the status quo between the parties.**

As a threshold issue, the district court erred by accepting the magistrate judge's recommendation that Born Again is seeking a disfavored injunction that would disrupt the status quo because Colorado theoretically could have brought an enforcement action against Born Again under a regulation that has been on the books since 2009, even before the challenged amendment. 3.App.800 (citing 3 Colo. Code Regs. § 708-1:81.6(A)(4)). That rule, which has never been enforced against Born Again, is irrelevant to determining whether Born Again seeks a disfavored injunction. And the district court's conclusion to the contrary reflects a basic misunderstanding of what qualifies as the status quo.

To decide whether an injunction is disfavored, the "status quo is not defined by the parties['] existing *legal rights*." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100 (10th Cir. 1991), *holding modified on other grounds by O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004). Instead, "it is defined by the *reality* of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." *Id.*

That statement reflects "this Circuit's historic understanding of what constitutes the status quo." *O Centro*, 389 F.3d at 981 (Murphy, J. concurring in part) (quoting the same language). And it makes logical sense. Otherwise, the question of what counts as the status quo—in the district court's view, whether Colorado "was at all times legally entitled to enforce" CADA against Born Again—would merge with the question of whether the plaintiff "is likely to prevail on the merits." *Id.* at 981–82 (Murphy, J., concurring in part). But that is not the law. *Id.* at 982 & 982 n.4 (Murphy, J., concurring in part).

On the actual question that controls—"the *reality* of the existing status and relationships between the parties" before this conflict arose, *SCFC*, 936 F.2d at 1100—Colorado conceded below that it has not yet sought to enforce CADA against Born Again for any reason, much less for its use of given names and biologically correct terms and pronouns. 1.App.219; 3.App.740. And Born Again never conceded that Rule 81.6(A)(4) required it to limit its speech—it certainly never muzzled itself out of fear that it might violate the regulation. Born Again believes that any such speech-limiting effects of the rule would violate the Constitution for all the same reasons the challenged provisions do. So the status quo is Born Again's non-compliance with the challenged provisions and the rule. A preliminary injunction would preserve—not disrupt—that status quo.

Finally, the district court's apparent belief that the 2025 amendment merely codified Rule 81.6(A)(4)'s definition of sexual-orientation harassment is based on the same atextual misreading of the amendment that Colorado has advanced throughout this case. *See, infra* at 38. Nothing in the amendment's text or the CADA provisions impacted by that amendment suggests they incorporate an unwritten harassment standard or the subjective and objective elements Colorado has read into Rule 81.6(A)(4). *See* 2.App.300, 321–22. As Born Again argued below, the Act goes further than the rule. 2.App.321–22. And while the other provisions were in place before the amendment, Born Again seeks an injunction now because the amendment's speech-infringing redefinition of "gender expression" infuses the way Colorado will enforce all those other provisions. 2.App.322. "Thus, the Act's passage was the definitive moment when the status quo between the parties changed." *Id.*

"The failure of the district court to apply the correct standard in evaluating [Born Again's] request for a preliminary injunction amounts to an abuse of discretion." *O Centro*, 389 F.3d at 982 n.5 (Murphy, J., concurring in part). "Nevertheless, because the record on appeal is sufficiently well developed, it is appropriate for this court to determine in the first instance whether [Born Again] has met the requisite burden." *Id.* (Murphy, J., concurring in part). For the reasons given below, Born Again has more than met that burden. Indeed, it has even met the higher burden the district court wrongly imposed.

## II. Born Again faces a credible threat of enforcement.

Like nearly all plaintiffs bringing a pre-enforcement suit, Born Again "has not yet been subject to" CADA's penalties, "nor has any enforcement authority explicitly threatened to charge [it] under the statute." *Peck*, 43 F.4th at 1129. But that is not dispositive. If it were, pre-enforcement suits would all but disappear. Instead, the "First Amendment context creates unique interests that lead [the Court] to apply the standing requirements somewhat more leniently, facilitating pre-enforcement suits." *Id.*

Specifically, a plaintiff bringing a First Amendment claim can show standing by showing (1) that it has "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that the conduct is arguably "proscribed by statute," and (3) that "there exists a credible threat of prosecution thereunder." *Id.* And in cases like this one that also involve chilled speech, a plaintiff can show standing by showing (1) "a credible threat of future prosecution," and (2) an "ongoing injury resulting from the statute's chilling effect on [its] desire to exercise [its] First Amendment rights." *Id.* (citation modified).

As the district court noted, both tests require a plaintiff to show a credible threat of enforcement. 3.App.803. That likely explains why it denied Born Again's preliminary-injunction motion without analyzing its chilled-speech claims separately. (That and the fact that no one has disputed Born Again's ongoing injury from chilling its speech.)

The district court never asked whether Born Again's speech is arguably affected with a constitutional interest and arguably proscribed by statute. At most, it noted in passing three times that Born Again's conduct "in and of itself" "does not appear on its face to violate CADA." 3.App.794, 804–05. But a plaintiff "need not show that his intended conduct *actually* violates the law, just that it *arguably* does." *Scott v. Allen*, 153 F.4th 1088, 1096 (10th Cir. 2025); *accord Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) ("arguably proscribed" is enough); *Sanchez v. Torrez*, 173 F.4th 1202, 1214 (10th Cir. 2026) (same). And the district court never asked that question.

For good reason. Colorado all but conceded that Born Again's speech arguably violates CADA's challenged provisions following the 2025 amendment—even under Colorado's atextual reading of the Act. Director Sullivan conceded it's "possible" that Born Again's intentional "misgendering" could violate CADA. 3.App.596–98, 656. And Colorado's proposed expert repeatedly bolstered that concession. *Supra* at 19. While the district court did not address the question, Colorado's concession that Born Again's speech is arguably proscribed by CADA helps establish that Born Again faces a credible threat that Colorado will enforce CADA against it.

### A. Far from disavowing, Colorado repeatedly conceded enforcement against Born Again is possible, and the company shouldn't have to bet the farm to find out.

"[S]howing a credible threat of enforcement is not a high bar." *Sanchez*, 173 F.4th at 1214. And a defendant's failure to disavow its intent to enforce a challenged statute against a particular plaintiff is a good indication that a credible threat exists. Indeed, this Court has "noted that 'the threat of prosecution is generally credible where the defendant has not disavowed any intention of invoking the statute against the plaintiff.'" *Id.* (citation modified) (quoting *RMGO*, 121 F.4th at 110). And that makes sense. The government defendant—not the plaintiff—is in the best position to know whether it intends to enforce a challenged law against a particular plaintiff for specific conduct.

So when the government refuses to disavow that potential enforcement, courts do not force plaintiffs to "bet the farm, so to speak, by taking the violative action" before they can test "the validity of the law in a suit for an injunction." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007). "Establishing standing does not require that a litigant fly as a canary into a coal mine before she may enforce her rights." *Bryant v. Woodall*, 1 F.4th 280, 286 (4th Cir. 2021).

Nor does it require the canary to *stay* in the coal mine until it's too late. But that's exactly what accepting Colorado's position would require. Colorado repeatedly stated it could not yet say whether it would enforce the challenged CADA provisions against Born Again

33

because it had not yet received a complaint from an actual complainant who claims to have been denied the full and equal enjoyment of Born Again's goods and services. 1.App.219; 2.App.385. But by the time Colorado receives that complaint, it will be too late for Born Again to avoid the administrative burdens and possible civil and criminal penalties that can result from violating CADA. That's why a *promise* to enforce is not required to create a credible threat. A failure to disavow is enough. *Sanchez*, 173 F.4th at 1214.

What's more, Colorado's concessions that it *might* enforce CADA against Born Again to punish it for its speech went much further than a mere failure to disavow. Colorado conceded a public accommodation's "refusal to use a customer's preferred pronouns," as Born Again refuses to do, "may impact that customer's full and equal enjoyment of the goods, services, benefits or privileges offered by the place of public accommodation." 2.App.345. And Director Sullivan conceded that it's "possible" that intentional "misgendering," as Born Again would do but for the recent amendment, could violate CADA. 3.App.656. When pressed, she could not even disavow that the Division would find that a *single instance* of "misgendering" violates CADA. 3.App.654–55.

Not that any of that is surprising. Colorado has a long history of vigorously enforcing CADA—even when that means trampling the First Amendment rights of those who disagree with the State's viewpoint. *See, e.g., 303 Creative*, 600 U.S. at 588 ("As surely as Ms. Smith seeks to

engage in protected First Amendment speech, Colorado seeks to compel speech Ms. Smith does not wish to provide."); *Masterpiece Cakeshop*, 584 U.S. at 639 ("The official expressions of hostility to religion in some of the commissioners' comments—comments that were not disavowed at the Commission or by the State at any point in the proceedings that led to affirmance of the order—were inconsistent with what the Free Exercise Clause requires.").

And the phrase "full and equal enjoyment" has traditionally been broadly defined, giving the State plenty of textual runway to impose its views on public accommodations like Born Again. *See* Elizabeth Sepper, *The Original Meaning of "Full and Equal Enjoyment" of Public Accommodations*, 11 Cal. L. Rev. Online 572 (2021). As the relevant "history shows, state courts of the 1950s and '60s understood 'full and equal' accommodations to guarantee equal, customary, *and courteous* treatment." *Id.* at 584 (emphasis added). Limiting CADA to "outright refusals of service" would mean "overlook[ing] the ordinary and original meaning of its text." *Id.* And Colorado has shown zero interest in adopting such a narrow reading. *Accord Wyatt Bury, LLC v. City of Kansas City*, 804 F. Supp. 3d 939, 959–60 (W.D. Mo. 2025) (finding standing at the preliminary-injunction phase where plaintiffs alleged they violated a city's public-accommodation ordinance by declining to use preferred pronouns, and the city did not disavow that interpretation).

For its part, the district court conceded that Colorado had "not completely disavowed any possible prosecution" of Born Again "under any circumstances." 3.App.807. But the court thought that such a disavowal was "not required" because Born Again had to "demonstrate a credible threat of prosecution." *Id.*

That circular reasoning fails. A failure to disavow helps show that a credible threat exists. *Sanchez*, 173 F.4th at 1214. It cannot be waived away by prematurely assuming the conclusion that a credible threat does not exist. Nor is it enough that Colorado says its enforcement decisions will depend on the facts of any given case. 1.App.143, 219; 2.App.385; 3.App.654–55. As the Fifth Circuit observed in response to a similar non-disavowal, such statements provide "cold comfort" to parties who fear they might find themselves in the government's crosshairs, even in the absence of any past enforcement. *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 329–30 (5th Cir. 2025). And as the Ninth Circuit held in a case challenging the Trump administration's withholding of grants from so-called "sanctuary" cities, the mere "*possibility* of non-enforcement does not mean that [plaintiffs] lack standing." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018) (emphasis added) (applying *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)).

Likewise, in *Chiles v. Salazar*, this Court correctly observed that "'the state's staunch refusal to disavow prosecution has heavy weight' where '[t]here is nothing, not even their word,' to prevent" state officials from enforcing a statute. 116 F.4th 1178, 1198 (10th Cir. 2024), *rev'd and remanded on other grounds,* 146 S. Ct. 1010 (2026) (quoting *Peck*, 43 F.4th at 1133). In that case, this Court never addressed whether Colorado had prosecuted similar conduct or whether private parties could file complaints. *See id.* at 1198–99. Colorado's failure to disavow was enough. *Id.* And it would be enough here, too, even if the other two prongs didn't weigh so heavily in Born Again's favor. *See Chiles*, 146 S. Ct. at 1019 n.\* (agreeing that "no more is required" to find standing than Colorado's dogged defense of its law and its refusal to disavow).

## B. Colorado's claim that Born Again's written policy and blog post don't violate Colorado's atextual reading of the Act doesn't negate the threat even as to them.

While Colorado repeatedly refused to deny that it might enforce the challenged CADA provisions against Born Again based on its interactions with potential customers and members of the public, Colorado did eventually say that Born Again's written pronoun policy and its planned blog post did not, "[b]y themselves," violate the relevant CADA provisions. 2.App.339–43, 386. But it based that conclusion on an atextual and non-binding interpretation of the relevant provisions. *Id.* And that is not enough to remove the credible threat of enforcement.

First, the atextual nature of Colorado's reading of the 2025 amendment does not eliminate the threat posed by its plain text. When the State amended CADA's definition of "[g]ender expression" to include "chosen name" and "how the individual chooses to be addressed," Colo. Rev. Stat. § 24-34-301(9), it did not use any language suggesting that it meant to incorporate the subjective and objective components Colorado apparently has read into Rule 81.6(A)(4) and insists should be read into CADA and the 2025 amendment, *contra* 1.App.143–44, 212; 2.App.336–37; 3.App.594, 647–48. Nor did its plain text adopt the intent requirement that Colorado says should apply. *Contra* 2.App.336; 3.App.594. Nor the requirement that offending language create a "hostile environment" that rises to the level of harassment. *Contra* 2.App.338, 343.

Indeed, Colorado admitted at oral argument that "the harassment standard is not in the statute," just "in [the] rule." 3.App.737. And all Director Sullivan could say was that, while "these words are not in the Colorado Anti-Discrimination Act," the "analysis is implicit" in deciding whether a violation occurred. 3.App.606; *accord* 3.App.601–02, 616, 618.

That atextual interpretation cannot be enough to keep Born Again out of court. To hold otherwise would leave Born Again's First Amendment rights to "exist only at the sufferance" of the State of Colorado. *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 711 (4th Cir. 1999).

Second, Director Sullivan's "representations in this litigation are not binding on this or future administrations." *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1193 (10th Cir. 2000) (finding a "sufficiently well-founded" "fear of prosecution … to support Article III standing" given non-binding nature of disavowals). And such non-binding statements provide "no guarantee that the [State] might not tomorrow bring its interpretation more in line" with CADA's "plain language." *Bartlett*, 168 F.3d at 711. "Without such a guarantee," Born Again will continue to "suffer from the reasonable fear that it can and will be prosecuted" for its speech, including the publication of its written pronoun policy and blog post. *Id.*

## C. Colorado has enforced CADA against nearly identical conduct: an entity's decision to label a person who identifies as "female" as "male" in its internal system.

Although not required, Colorado's past enforcement against expressive conduct that is nearly identical to Born Again's expression bolsters the conclusion that Born Again faces a credible threat of enforcement. Even before the 2025 amendment added "how [an] individual chooses to be addressed" to CADA's definition of "[g]ender expression," Colo. Rev. Stat. § 24-34-301(9), Colorado enforced CADA against an entity whose conduct—if anything—was less "offensive" than Born Again's engagement with transgender-identifying customers.

Specifically, the Division issued a probable-cause finding against a blood bank that had declined to label a biologically male donor "female" after the donor tried to identify as female in the blood bank's system. 2.App.385; *DE*.6.Sealed.App.10, 27. Upon investigation, the blood bank explained that it was "working on updating its system to enable it to prompt" certain screening questions usually asked only of males "even when a trans woman identifies as 'female.'" *DE*.6.Sealed.App.11.

Despite that explanation, the Division found probable cause to believe the donor "was not provided equal treatment to donors outside her protected class, because she was not allowed to self-identify her gender in her donor profile." *DE*.6.Sealed.App.144. So the evidence was "sufficient to substantiate a claim of discriminatory denial of full and equal enjoyment of a place of public accommodation." *DE*.6.Sealed.App.144–45. And the Division reached that conclusion seemingly *without* applying Rule 81.6(A)(4)'s subjective and objective harassment standard. *Id.*

The district court agreed with the Division that labeling someone "male" who identifies as "female" qualifies as a "denial of full and equal enjoyment of goods and services." 3.App.807. But it's not clear why the court thought that was distinguishable from this case. "In the blood bank case," the court wrote, "the complainant 'was not provided equal treatment to donors outside her protected class, because she was not allowed to self-identify her gender in her donor profile.'" 3.App.808. But that just restates the Division's finding. It doesn't distinguish it.

And the district court's next statement—that the complainant was "denied the services of the public accommodation[]" based on gender identity—fares no better. *Id.* The only "service" identified was being able to self-identify as female *in the blood bank's system*. 2.App.385; 3.App.807–08; *DE*.6.Sealed.App.10–11, 27, 144–45. And it's not clear how that's any worse under CADA than Born Again intentionally greeting transgender-identifying customers with biologically correct honorifics and referring to them using biologically correct pronouns within their earshot. 1.App.32; 2.App.355, 362, 364, 367.

Given that enforcement history, combined with Colorado's failure to disavow that it will enforce the challenged provisions against Born Again if it uses biologically correct language when interacting with transgender-identifying customers, Born Again has more than met its burden to show that it faces a credible threat of enforcement.

## D. The existence of a non-moribund statute, combined with Colorado's failure to disavow, proves the threat.

As *Chiles* shows, a credible threat can exist even without any history of enforcement. 116 F.4th at 1198–99. The "Supreme Court and at least four other circuits have sustained pre-enforcement standing without a past enforcement action or an overt threat of prosecution directed at the plaintiff." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 140 & n.5 (2d Cir. 2023) (per curiam).

What's more, some circuits apply a "presumption" that a credible threat exists when a "non-moribund statute…facially restricts" the plaintiff's expression, absent "compelling evidence to the contrary." *Bartlett*, 168 F.3d at 710 (citation modified); *accord Hedges v. Obama,* 724 F.3d 170, 197 (2d Cir. 2013) (noting the Supreme Court "appears willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund") (citation modified); *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) (observing that "the existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper"); *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 16 (1st Cir. 1996) (applying presumption because the state could not "convincingly demonstrate" the statute was "moribund" or would "not be enforced"). And while it does not appear this Court has adopted a similar presumption, the Court should do so here to avoid reaching a result that would be different in these other circuits.

E. **The ability of private parties to initiate enforcement proceedings confirms that the threat is imminent and credible.**

Finally, as even the district court seemed to recognize, the fact that "'anyone in the State may file a complaint … and initiate a potentially burdensome administrative hearing process,'" 3.App.809 (quoting *303 Creative*, 600 U.S. at 583), supports the conclusion that Born Again faces a credible threat of enforcement.

Any person "claiming to be aggrieved by a discriminatory or an unfair practice" can file a charge of discrimination with the Division. Colo. Rev. Stat. § 24-34-306(1)(a)(I). And the burdensome "administrative action" that can result "may give rise to harm sufficient to justify pre-enforcement review." *SBA List*, 573 U.S. at 165.

What's more, Colorado conceded that, to file a complaint against a public accommodation under the Publication Clause, the Unwelcome Clause, the Denial Advertisement Clause, the Discriminatory Advertisement Clause, or the Unwelcome Advertisement Clause, a person does not have to "sincerely desire[] or intend[] to patronize the complained-of place of public accommodation." 2.App.346.

The ease with which "anyone in the State may file a complaint," *303 Creative*, 600 U.S. at 583, makes the threat of enforcement even more imminent for Born Again and its owner. During a six-month period around the time Colorado passed the amendment, the bookstore had three separate interactions with potential customers who seemingly identified as transgender. 2.App.361, 366. The first ended cooly when one of the bookstore's employees identified a long-haired boy as a couple's "son," prompting the teen's father to respond, "[W]e don't have a son." 2.App.361. And in the second and third instances, Born Again's owner and employees chilled their speech to avoid running afoul of the law by refraining from using the gendered language they normally use with customers. 2.App.354–55, 362–65.

As a result of these interactions and the hundreds of other interactions Born Again has with members of the public each week, the bookstore is "always at risk of receiving a request to use pronouns or titles that would violate the store's religious faith." 1.App.29, 32. And if one of those customers makes that request and then takes offense when employees decline and then use biologically correct language to refer to them within earshot, that can result in a charge being filed with the Division that ultimately results in a probable-cause finding and—at the very least—a burdensome administrative process. 2.App.364–65, 367.

Director Sullivan's inability to disavow that the Division might enforce the challenged provisions against Born Again based on a scenario like that proves that Born Again's fears are well-founded. 2.App.333–39; 3.App.596–98, 654–56. And Colorado's own expert, Dr. Meyer, testified that transgender-identifying people reasonably feel unwelcome, disrespected, or objectionable when referred to using biologically correct pronouns. 2.App.545–46. Even if the "misgendering" merely involved two employees talking to each other, it still "would send a message of derision." 2.App.543–44. Assuming Colorado shares its own expert's views, that would be enough to trigger a probable-cause finding even under Colorado's atextual test for deciding whether a CADA violation has occurred. 1.App.143–44, 212; 2.App.336–37; 3.App.594, 647–48. Against this backdrop, Born Again's decision to chill its speech is reasonable because the threat of enforcement is real.

**III. Born Again is entitled to a preliminary injunction to prevent enforcement while the case proceeds, and this Court should direct the district court to grant that relief.**

"If the district court fails to analyze the factors necessary to justify a preliminary injunction," this Court "may do so if the record is sufficiently developed." *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009). Given the substantial amount of discovery the parties have already conducted, that standard is satisfied here. "The record we have is the record the parties chose to create below—it is the record they deemed sufficient for the district court to decide the preliminary injunction question." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) (plurality). It is sufficient for this Court to decide the question, too. And the Court should decide it given the substantial First Amendment rights that are at stake.

On the merits, other than citing a broad "compelling interest" in eliminating discrimination, 1.App.181; 3.App.786, Colorado has not tried to contest Born Again's claims that the 2025 amendment's broadening of what qualifies as discrimination based on "gender expression" under CADA cannot survive constitutional review.[4] Nor can it.

---

[4] At the same time, "Colorado's strenuous assertion that it has a compelling interest in enforcing CADA indicates that enforcement is anything but speculative." *303 Creative*, 6 F.4th at 1174.

### A. The challenged provisions compel and restrict Born Again's speech based on content and viewpoint, and they fail strict scrutiny.

Start with Born Again's speech claims. The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). And it bars the State from making a speaker "speak as the State demands or face sanctions for expressing her own beliefs." *303 Creative*, 600 U.S. at 589. To honor a customer's "gender expression," Born Again must speak "how the individual chooses to be addressed." Colo. Rev. Stat. § 24-34-301(9). So the Denial Clause arguably forces it to use pronouns it rejects and stop using language that reflects the company's views about God's design for human sexuality. And the rest of the challenged provisions threaten enforcement for Born Again's written pronoun policy and planned blog post while forcing it to continue to muzzle its employees in day-to-day interactions with customers who identify as transgender.

Each path rewrites the message. For Born Again, the "mode of address [is] the message." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). Calling a man a "gentleman" and a woman a "lady" endorses God's design. Forcing the opposite makes the company "mouth support for views [it] find[s] objectionable." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018). And that alone is enough to offend the First Amendment. *303 Creative*, 600 U.S. at 603.

Indeed, as the Supreme Court reaffirmed in *303 Creative*, "the First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided and likely to cause anguish or incalculable grief." 600 U.S. at 586 (citation modified). And as a general rule, "the government may not compel a person to speak its own preferred messages." *Id.*

In that case, Colorado put the plaintiff website designer to a choice: "If she wishe[d] to speak," she was forced to "either speak as the State demand[ed] or face sanctions for expressing her own beliefs, sanctions that may include compulsory participation in remedial training, filing periodic compliance reports as officials deem necessary, and paying monetary fines." *Id.* at 589 (citation modified). Under the Supreme Court's cases, that was enough, "more than enough, to represent an impermissible abridgement of the First Amendment's right to speak freely." *Id.* And that's equally true of the choice Colorado is attempting to force Born Again to make here, too.

The provisions also turn on content and viewpoint. Compelling particular terms and pronouns "alters the content of the speech." *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795 (1988). And it picks a side, compelling the view that sex is mutable and barring the view that sex is fixed. That favoritism reflects Colorado's "disapproval of a subset of messages it finds offensive," and that is textbook viewpoint

47

discrimination. *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (citation modified). "Giving offense is a viewpoint," so a law disfavoring offensive speech is facially invalid. *Matal v. Tam*, 582 U.S. 218, 243 (2017).

Content- and viewpoint-based laws must clear strict scrutiny— "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). "Under that test, it is rare that a regulation will ever be permissible." *Chiles*, 146 S. Ct. at 1021 (citation modified). And the fact that CADA engages in viewpoint discrimination renders the First Amendment violation "all the more blatant," as it represents "'an egregious form' of content regulation, and governments in this country must nearly always 'abstain' from it." *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

Colorado pleads only a broad interest in ending discrimination. But it must justify "denying an exception" to Born Again. *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021). It cannot. Colorado can protect equal access by regulating sales, not speech. And other bookstores push the opposite view unpunished, so no compelling interest supports silencing this one. *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 478 (2007) (requiring a compelling interest for "each application" of a speech restriction). The First Amendment "safeguards not only popular ideas; it secures, even and especially, the right to voice dissenting views." *Chiles*, 146 S. Ct. at 1024. And Born Again should be allowed to keep expressing its dissenting views while this case proceeds below.

**B. The challenged definitions and the Unwelcome Clauses are also vague and overbroad.**

Two more defects sink the new definitions for "gender expression" and "chosen name" and the two Unwelcome Clauses on their face.

First, the definitions are unconstitutionally vague. A law is unconstitutionally vague under the Due Process Clause if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023). And the 2025 amendment fails on both fronts—it compels "chosen" names while exempting "offensive" and "frivolous" ones without defining either term, forcing regulated entities to guess which chosen names they can safely avoid and handing Colorado open-ended discretion to crack down on viewpoints it dislikes.

That is exactly what the Fourteenth Amendment's vagueness doctrine forbids. And the Supreme Court has repeatedly held that similarly worded language is unconstitutionally vague. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 246–47, 258 (2012) (holding "patently offensive" standard for television broadcasts unconstitutionally vague as applied to two broadcasts); *City of Chicago v. Morales*, 527 U.S. 41, 62–64 (1999) (holding that a statute banning assembly for "no apparent purpose" was unconstitutionally vague on its face); *Coates v.*

*City of Cincinnati*, 402 U.S. 611, 614 (1971) (holding that a statute banning assembly "in a manner annoying to persons passing by" was unconstitutionally vague and overbroad on its face). This Court should reach the same result here.

Second, the Unwelcome Clauses are both unconstitutionally vague *and* overbroad, sweeping in any speech a listener calls "unwelcome," "objectionable," "unacceptable," "undesirable," or not "solicited" without limitation. Colo. Rev. Stat. §§ 24-34-601(2)(a), 24-34-701(1)(c). Courts regularly invalidate similar language. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963) (ban on "objectionable" publications unconstitutionally vague); *Brush & Nib Studio, LC v. City of Phoenix*, 418 P.3d 426, 442–43 (Ariz. Ct. App. 2018) (striking down "unwelcome," "objectionable," "unacceptable," "undesirable," and "not solicited" language as unconstitutionally vague), *opinion vacated in part on other grounds,* 448 P.3d 890 (Ariz. 2019); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215–17 (3d Cir. 2001) (Alito, J.) (invalidating policy covering "any unwelcome verbal, written or physical conduct" as facially overbroad); *Armstrong v. D.C. Pub. Libr.*, 154 F. Supp. 2d 67, 77–79 (D.D.C. 2001) (invalidating regulation denying library access to patrons with an "objectionable" appearance as vague and overbroad). This Court should do the same.

### C. The remaining factors favor an injunction.

The "loss of First Amendment freedoms for even minimal periods of time" is irreparable injury. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (citation modified). Born Again is chilling its speech right now by not publishing its written pronoun policy and blog post. And so long as its doors remain open, Born Again endures the risk every day that it will be forced to choose between chilling its speech and facing potential enforcement under CADA.

The balance of harms and the public interest follow. Colorado gains nothing from enforcing a likely unconstitutional law, and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (citation modified). Accordingly, entry of a preliminary injunction is appropriate now.

## CONCLUSION

Born Again does not seek to upset the status quo. It seeks only to speak freely consistently with its religious beliefs, as it could do before Colorado broadened the Act and aimed its enforcement machinery at the bookstore's speech.

The record shows a credible threat at every turn: a State that will not disavow enforcement, a probable-cause finding against nearly identical conduct, a complaint process open to anyone, and the State's own expert confirming that Born Again's truthful speech would make someone feel like they might not be served. This Court should reverse and direct the district court to enter the requested preliminary injunction on remand.

# STATEMENT REGARDING ORAL ARGUMENT

Born Again requests oral argument to assist the Court in addressing the fundamental issues of pre-enforcement standing and First and Fourteenth Amendment freedoms raised in this appeal.

Dated: June 8, 2026

Respectfully submitted,

/s/ Christopher P. Schandevel

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Jonathan A. Scruggs
Henry W. Frampton, IV
Mercer Martin
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org
mmartin@ADFlegal.org

Christopher P. Schandevel
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cschandevel@ADFlegal.org

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,652 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: June 8, 2026

        *s/Christopher P. Schandevel*
        Christopher P. Schandevel
        *Counsel for Appellant*

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Cortex XDR, Agent version 7.8.1, and according to the program are free of viruses.

*s/Christopher P. Schandevel*
Christopher P. Schandevel
*Counsel for Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2026, I electronically filed the foregoing Opening Brief with the Clerk of Court for the United States Court of Appeals for the Tenth Circuit using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

/s/ Christopher P. Schandevel
Christopher P. Schandevel
*Counsel for Appellant*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Regina M. Rodriguez

**Civil Action No. 25-cv-01572-RMR-MDB**

DEFENDING EDUCATION, *et al.*,

      Plaintiffs,

v.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division (the "Division"), in her official capacity;
SERGIO RAUDEL CORDOVA, GETA ASFAW, MAYUKO FIEWEGER, DANIEL S. WARD, JADE ROSE KELLY, and ERIC ARTIS, as members of the Colorado Civil Rights Commission, in their official capacities; and
PHIL WEISER, Colorado Attorney General, in his official capacity,

      Defendants.

**Civil Action No. 25-cv-01668-RMR-MDB**

COMMITTEE OF FIVE, INC. d/b/a XX-XY ATHLETICS,

      Plaintiff,

v.

AUBREY C. SULLIVAN, Director of the Division, in her official capacity, *et al.*,

      Defendants.

**Civil Action No. 25-cv-02177-RMR-MDB**

DOXA ENTERPRISES, LTD d/b/a Born Again Used Books,

      Plaintiff,

v.

AUBREY C. SULLIVAN, Director of the Division, in her official capacity, *et al.*,

      Defendants.

---

## ORDER ADOPTING MAGISTRATE JUDGE RECOMMENDATION

---

This matter is before the Court on the Recommendation of United States Magistrate Judge Maritza Dominguez Braswell. On February 19, 2026, Magistrate Judge Braswell held a hearing addressing three motions for preliminary injunction in three related cases: *Defending Education, et al, v. Sullivan, et al.*, No. 25-cv-01572-RMR-MDB ("Defending Education"); *Committee of Five, Inc. v. Sullivan, et al.*, No. 25-cv-01668-RMR-MDB ("Committee of Five"); and *Doxa Enterprises, Ltd., v. Sullivan, et al.*, No. 25-cv-02177-RMR-MDB ("Doxa"). At the end of the hearing, Magistrate Judge Braswell pronounced the Recommendation: *Defending Education*, ECF No. 102; *Committee of Five*, ECF No. 87; and *Doxa*, ECF No. 49.

The motions addressed in the Recommendation are motions for preliminary injunction filed by Plaintiff(s) in each case: *Defending Education*, ECF No. 27; *Committee of Five*, ECF No. 15; and *Doxa*, ECF No. 4. Magistrate Judge Braswell recommends denying each motion for preliminary injunction. Plaintiff(s) timely filed an objection to the Recommendation in each case: *Defending Education*, ECF No. 110; *Committee of Five*, ECF No. 95; and *Doxa*, ECF No. 57. Defendants filed a response in each case: *Defending Education*, ECF No. 112; *Committee of Five*, ECF No. 97; and *Doxa*, ECF No. 59.

The Court has reviewed the Recommendation, as well as the objections, the responses, the record, and the pleadings in each case. For the reasons stated below, the Court overrules the objections and adopts the Recommendation.

## I.    BACKGROUND

The central issue in this case is whether the Court should enjoin enforcement of Colorado's amended anti-discrimination law. All Plaintiffs allege the amended statute unconstitutionally regulates their speech, violating the First and Fourteenth Amendment.[1] The Colorado Anti-Discrimination Act ("CADA") prohibits discrimination in places of public accommodation. *See* Colo. Rev. Stat. § 24-34-601. In May 2025, Colorado passed HB25-1312 (the "Act"), which amends portions of the CADA. Plaintiffs challenges the constitutionality of CADA's discrimination in places of public accommodation statute with the Act's amended definitions.

### A.  Colorado Statutes at Issue

The "Discrimination in places of public accommodation" statute under CADA as amended states:

> It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, **gender identity**, **gender expression**, marital status, national origin, or ancestry the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation **or, directly or indirectly, to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence at a place of public accommodation is**

---

[1] Because these cases involve "a common question of law or fact," the Court addresses the *Defending Education*, *Committee of Five*, and *Doxa* preliminary injunction motions in this consolidated Order "to avoid unnecessary cost or delay" under Fed. R. Civ. P. 42(a).

> **unwelcome, objectionable, unacceptable, or undesirable** because of disability, race, creed, color, sex, sexual orientation, **gender identity**, **gender expression**, marital status, national origin, or ancestry.

Colo. Rev. Stat. § 24-34-601(a)(2) (emphases added). The Act amends CADA's definition

of "gender expression" to:

> an individual's way of reflecting and expressing the individual's gender to the outside world, typically demonstrated through appearance, dress, behavior, **chosen name**, and how the individual chooses to be addressed.

*Id.* § 24-34-301(9) (emphasis added). It also amends "chosen name" to mean:

> a name that an individual requests to be known as in connection to the individual's disability, race, creed, color, religion, sex, sexual orientation, gender identity, gender expression, marital status, familial status, national origin, or ancestry, so long as the name does not contain offensive language and the individual is not requesting the name for frivolous purposes.

*Id.* § 24-34-301(3.5). And finally, "gender identity" is defined under CADA as:

> an individual's innate sense of the individual's own gender, which may or may not correspond with the individual's sex assigned at birth.

*Id.* § 24-34-301(10).

### B. Background on *Defending Education*, *Committee of Five*, and *Doxa* Plaintiffs

*Defending Education* plaintiffs are various non-profit organizations (Defending

Education, Colorado Parent Advocacy Network, Protect Kids Colorado, and Do No

Harm), two individuals (Dr. Travis Morrell and Dr. Valeri Leswing), and Dr. Leswing's

medical practice, Mountain Pediatrics. *Defending Education*, ECF No. 27 at 12-13. The

organizations "hold traditional views on matters of sex and gender identity" and "believe

that sex is determined at birth and immutable." *Id.* at 13. They host events in places of public accommodation and want "to refer to individuals at these events using biological pronouns, birth names, and other biologically accurate terms, even if those pronouns, names, or terms conflict with an individual's self-professed gender identity or expression." *Id.* at 13. Dr. Morrell and Dr. Leswing possess "scientific, objective, and reproducible views on matters of sex and gender identity." *Id.* at 14. Dr. Morrell also "wants to refer to individuals using birth names and biologically accurate pronouns and other terms" when writing or speaking publicly about issues of sex and gender. *Id.* Dr. Leswing "wishes to issue a public statement notifying potential patients that she will not refer to them using chosen names, preferred pronouns, or other non-biological terms." *Id.* at 15.

The *Defending Education* organizations allege the Act forces them to stop addressing individuals by their biological pronouns in places of public accommodation and prohibits them from publishing materials that refer to individuals using biologically accurate pronouns, birth names, and other terms inconsistent with their purported gender identity or gender expression. *Id.* Dr. Morrell and Dr. Leswing "fear that their medical practices will be investigated and punished for their speech," and Dr. Morrell fears termination of his ownership interest or other disassociation from his medical practice if he is investigated. *Id.*

*Committee of Five* plaintiff is an athletic-apparel retailer called XX-XY Athletics ("XX-XY") with a distinct message and mission: "to empower women and protect women's sports and women's spaces." *Committee of Five*, ECF No. 1 ¶ 1. XX-XY's message and mission are "grounded in the belief that men and women are physiologically different; sex

5

is binary, biological, and immutable; women deserve the chance to be champions in their own sports." *Id.* XX-XY uses its platform to draw attention to "men and boys who compete in women's sports" and "refers to them with masculine pronouns and terms, often using their given name, rather than their chosen names." *Id.* ¶ 2. In one instance, XX-XY published a video on X "protesting a male athlete competing in girls' high-school track in Pennsylvania." *Id.* ¶ 3. The post included the text: "Sean 'Luce' Allen is having a track season to remember. Meanwhile girls are receiving a message they'll never forget. When boys run girls' track, they win. *And girls lose*." *Id.* The post refers to the athlete as a "boy" and uses the athlete's given name. *Id.* XX-XY alleges that if it could not refer to male athletes as "male," "men," or "boys," its advertisements would not make sense. *Id.* ¶ 4. It asserts that "the Act coerces the company to speak against its principles and alter the meaning of its core message." *Id.* ¶

Finally, *Doxa* plaintiff is a Christian bookstore, Born Again Used Books, in Colorado Springs with the "mission [] to provide literature that supports customers in their relationship with God and others." *Doxa*, ECF No. 4-1 at 10. To achieve this, Born Again Used Books "curates its selection according to its Christian faith, refusing to sell books with a message contradicting the store's mission of providing uplifting Christian support." *Id.* "To stay faithful to these beliefs," Born Again Used Books "will not use pronouns, honorifics, or other language inconsistent with a person's sex." *Id.* at 9. Additionally, it would like to "formalize this policy, publish it to its employees and customers, and publicly explain the religious basis for the policy, including by writing about it on the Bookstore's blog." *Id.* However, Born Again Used Books "happily sells books to everyone." *Id.* It "fears

6

that if it formalized its policy on gender identity and pronouns and spoke about that policy on its blog, Colorado would swoop in to punish it under CADA." *Id.* at 12.

*Defending Education* plaintiffs, XX-XY, and Born Again Used Books (collectively, "Collective Plaintiffs") seek as-applied pre-enforcement preliminary injunctions under the First and Fourteenth Amendment enjoining Defendants from enforcing CADA on them. *Defending Education*, ECF No. 25; *Committee of Five*, ECF No. 15; *Doxa*, ECF No. 4.

### C. First Amendment Pre-Enforcement Claims

To establish standing for its First Amendment pre-enforcement claim, Collective Plaintiffs must demonstrate they "intend[] to engage in arguably protected conduct that is covered by the challenged governmental action" and "face[] a credible threat of enforcement." *Gays Against Groomers v. Garcia*, No. 24-1473, 2026 WL 668378, at *5 (10th Cir. Mar. 10, 2026). The plain language of CADA's public accommodation statute describes prohibited "discriminatory conduct" as "to refuse, withhold from, or deny to an individual or a group, because of . . . gender identity, gender expression . . . the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a public place of accommodation." Colo. Rev. Stat. § 24-34-601. Therefore, Collective Plaintiffs' intended conduct—to refer to individuals using pronouns, honorifics, or titles that are consistent with that person's biological sex without denying goods or services—does not appear on its face to violate CADA or present a credible threat of enforcement. For these reasons, and those stated below, the Court accepts the Recommendation and denies each Collective Plaintiffs' Motion for Preliminary Injunction.

## II.    LEGAL STANDARD

The Court is required to make a de novo determination of those portions of a magistrate judge's recommendation to which a specific, timely objection has been made, and it may accept, reject, or modify any or all of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").

"[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property*, 73 F.3d 1057, 1060 (10th Cir. 1996).

## III.    THE RECOMMENDATION

Magistrate Judge Braswell opens and closes her Recommendation emphasizing that "[a] preliminary injunction is an extraordinary remedy, the exception rather the rule." *Doxa*, ECF No. 54 at 79:7-10 (quoting *Gunnison Cnty. Stockgrowers' Ass'n, Inc. v. U.S. Fish & Wildlife Serv.*, 707 F. Supp. 3d 1056, 1062 (D. Colo. 2023)); *id.* at 91:22-25. She also highlights several threshold considerations. First, there is no "freestanding constitutional right to pre-enforcement review in federal court." *Id.* at 79:22-80:2 (quoting *Uber Techs., Inc. v. Moss*, No. 1:25-CV-00096-DDD-KAS, 2025 WL 1420940, at *3 (D. Colo. Jan. 31, 2025)). Second, the injunctive relief requested is exceptionally broad. *Id.*

8

80:3-8. Third, the motions for preliminary injunction seek the same relief as its complaint, which is disfavored. *Id.* at 80:12-16 (citing *Free the Nipple v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019)). Fourth, granting a preliminary injunction would disturb rather than preserve the status quo. *Id.* at 81:5-11. And fifth, even if the Court were to enjoin Defendants from enforcing the challenged provisions, Collective Plaintiffs would still be required to comply with CADA or risk suit by an aggrieved individual. *Id.* at 81:18-25. Magistrate Judge Braswell explains the evidence "suggests that [Collective] Plaintiffs feel the pressure more significantly from the public at large than anything else. . . . Thus, from the Court's perspective, [Collective] Plaintiffs' own statements demonstrate that a preliminary injunction would be of limited practical value and would not cure the dilemma that they describe." *Id.* at 82:18-83:5.

Next, Magistrate Judge Braswell turns to the factors Collective Plaintiffs must prove to succeed on a request for pre-enforcement preliminary injunction. She first considers the likelihood of success on the merits and the fundamental question of standing. *Id.* at 83:9-22. Magistrate Judge Braswell explains that even if Collective Plaintiffs made a clear showing that their speech is actually prescribed and chilled, "the absence of a credible threat of enforcement can be dispositive in a pre-enforcement standing analysis." *Id.* at 84:13-20 (citing *Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 512 (6th Cir. 2025)). When analyzing credible threat of enforcement, Magistrate Judge Braswell evaluates three factors: (1) whether the Collective Plaintiffs showed past enforcement against the same conduct; (2) whether authority to initiate the charges was not limited to a prosecutor or an agency and instead

9

any person can file a complaint; and (3) whether the state disavowed future enforcement. *Id.* at 84:21-85:2. She also highlights that "[e]ach element must be supported in the same way as any other matter on which the [Collective] Plaintiff bears the burden of proof, *i.e.*, with the same manner and degree of evidence required at the successive stages of the litigation." *Id.* at 85:7-14 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). At the preliminary injunction stage, the plaintiff must make a "clear showing that she is likely to establish each element of standing." *Id.* at 85:15-22 (citing *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). Therefore, Magistrate Judge Braswell applies the clear showing standard. *Id.* at 85:23-86:6.

Magistrate Judge Braswell distinguishes *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1169 (D. Colo. 2023) and highlights that, in that case, Judge Domenico recognized the presumption of enforcement for new laws but did not adopt the presumption himself. *Id.* at 85:2-10. She also explains that Collective Plaintiffs overstates *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 387 (1988), because the statute in that case was directed at plaintiffs and imposed criminal prosecution as a penalty. *Id.* at 86:17-87:1. Then, she clarifies that Defendant Sullivan's interpretation of the subject CADA provisions, while not law, helps demonstrate that the mere act of speaking would not automatically trigger enforcement and that this operates like a disavowal under factor three (whether the state disavowed future enforcement). *Id.* at 87:15-88:23. Regarding factor one (whether the Collective Plaintiffs showed past enforcement against the same conduct), Magistrate Judge Braswell calls attention to the fact that the Colorado Civil Rights Division (the "Division") has not received any complaints about Collective Plaintiffs'

10

misgendering and that the Division has not warned them that their desired approach is unlawful. *Id.* at 88:24-89:6. She ultimately determines that these two of the three factors are enough to weigh against a finding of credible threat of enforcement and that Collective Plaintiffs have "not demonstrated a credible threat under the heavy burden that applies to these preliminary injunction motions." *Id.* at 90:2-25. With respect to factor two (whether authority to initiate the charges is limited to a prosecutor or an agency), Magistrate Judge Braswell states that any person can file a charge alleging discrimination under CADA. *Id.* at 90:9-14. Collective Plaintiffs contend that the authority to initiate charges remains with the Division, because it can choose which complaints to take action on. *Id.* at 90:15-20. Even if this factor weighed in favor of Collective Plaintiffs, Magistrate Judge Braswell finds the balance of the three factors weigh against them. *Id.* at 90:21-25. Thus, she determines that Collective Plaintiffs have not established a credible threat of enforcement to have standing.

Finally, Magistrate Judge Braswell notes that "the balance of harms and public interest do not favor the sweeping injunctions [Collective] Plaintiffs seek." *Id.* at 91:7-17. Thus, she recommends the preliminary injunction requests be denied.

## IV.    ANALYSIS

### A. Threshold Considerations

Collective Plaintiffs object to the Recommendation's threshold considerations, arguing that "none has merit." ECF No. 57 at 1. Plaintiff makes six arguments: (1) a preliminary injunction could be undone after trial; (2) a preliminary injunction would not disrupt the status quo; (3) preliminary injunctions are proper in pre-enforcement litigation;

(4) Collective Plaintiffs seek an appropriate scope of relief; (5) CADA's enforcement scheme counsels for preliminary relief, not against it; and (6) standing requirements are applied leniently in First Amendment cases. The Court addresses each argument below.

First, Collective Plaintiffs object to the Recommendation's fourth threshold consideration that they seek a disfavored injunction. Disfavored injunctions prompt "a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-the-harms factors." *Free the Nipple*, 916F.3d at 797. Collective Plaintiffs argue that they are not seeking a disfavored injunction because, although their complaints and motions for preliminary injunction seek the same relief, the preliminary injunction can be undone. *Committee of Five*, ECF No. 95 at 7-8; *Doxa*, ECF No. 57 at 7-8 (citing *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247 (10th Cir. 2001)). Collective Plaintiffs contend the instant case is similar to *Pierce*, where the Tenth Circuit determined "the preliminary injunction granted by the district court did not, as the defendants contend, afford the tribe substantially all the relief it might recover." 253 F.3d at 1278. The Court agrees. In *Pierce*, the plaintiff's complaint alleged that "the state was compelled to grant recognition to tribal motor vehicle registrations and titles pursuant to the Indian Commerce Clause, the Kansas Act for Admission, and other federal law." *Id.* at 1239. The preliminary injunction motion sought to "enjoin the Defendants from enforcing the Kansas motor vehicle registration and titling laws against the Plaintiff and any persons who operate or own a vehicle registered and titled the Tribal Code § 17-10-1 *et seq*." *Id.* Here, Collective Plaintiffs' complaint seeks a "preliminary and permanent injunction" to enjoin Defendants and those acting in concert with them from enforcing CADA as applied to Collective

Plaintiffs and "third-party speakers similarly situated to" them. *Committee of Five*, ECF No. 1 at 50; *Doxa*, ECF No. 1 at 40. Collective Plaintiffs' preliminary injunction requests only seek to enjoin Defendants from enforcing CADA as applied to Collective Plaintiffs. *Committee of Five*, ECF No. 15 at 1-2; *Doxa*, ECF No. 4 at 1-2. Thus, the Court is persuaded by Collective Plaintiffs' argument that granting their preliminary injunction requests would not afford them all the relief they might recover.

However, another type of disfavored injunction is one that would alter the status quo. *Free the Nipple*, 916 F.3d at 797. Collective Plaintiffs argue a preliminary injunction would not disrupt status quo. The Court disagrees. As Defendants note, the CADA provisions at issue were in place decades before the passage of the Act and, the "Commission Rules have explicitly outlined when misgendering and deadnaming rise to a CADA violation since 2009." *Committee of Five*, ECF No. 97 at 4; *Doxa*, ECF No. 59 at 4. Commission Rule 81.6(A)(4), which went into effect November 30, 2009, prohibits "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun" as unlawful harassment. 3 CCR 708-1-81.6(4). Thus, Collective Plaintiffs' argument that CADA as applied prior to the Act only prevented discrimination in furnishing tangible goods does not hold weight. Their requested injunctions would disrupt CADA's decades-long history. Accordingly, the Court agrees with the Recommendation's finding that Collective Plaintiffs seek a disfavored injunction.

Next, Collective Plaintiffs object to Magistrate Judge Braswell's determination that pre-enforcement actions are "particularly fraught" because there is no "freestanding constitutional right to pre-enforcement review in federal court." *Committee of Five*, ECF

13

No. 95 at 9; *Doxa*, ECF No. 57 at 9. They argue that the Tenth Circuit regularly grants pre-enforcement preliminary injunctions and that "*Uber Technologies* merely stands for the proposition that a pre-enforcement plaintiff seeking a preliminary injunction must show a credible threat to avoid an 'advisory ruling.'" *Committee of Five*, ECF No. 95 at 9; *Doxa*, ECF No. 57 at 9 (citing *Uber Technologies*, 2025 WL 1420940, at *3). The Court finds Collective Plaintiffs' reasoning coincides with the Recommendation. The Court interprets Magistrate Judge Braswell's statement that there is no "freestanding constitutional right to pre-enforcement review in federal court" to mean that a preliminary injunction is an extraordinary remedy and that Collective Plaintiffs must meet their burden in demonstrating the right to a pre-enforcement preliminary injunction. Collective Plaintiffs do not (and cannot) dispute this.

Fourth, Collective Plaintiffs contend the relief they seek is appropriate in scope and not "exceptionally broad" as stated in the Recommendation. *Committee of Five*, ECF No. 95 at 9; *Doxa*, ECF No. 57 at 9. The Court acknowledges that the Recommendation addresses all three preliminary injunction motions filed by different groups of plaintiffs. Thus, certain statements made in the Recommendation may apply more directly to some plaintiff's motions and not others. The Court agrees that injunctive relief must be "narrowly tailored to remedy the harm shown." *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002). However, the scope of each Collective Plaintiffs' relief requested was not the basis for the recommended denial of injunctive relief, and the Court will not give this consideration extra weight.

Fifth, Collective Plaintiffs object to the Recommendation's interpretation of CADA's enforcement scheme as it relates to their motions for preliminary injunction. Collective Plaintiffs argue "an injunction need not relieve every conceivable injury to provide an appropriate remedy." *Committee of Five*, ECF No. 95 at 10; *Doxa*, ECF No. 57 at 10 (citing *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021)). The Recommendation does not bring up CADA's private right of action to indicate that an injunction needs to relieve "every conceivable injury." Instead, CADA's private right of action allows individuals to file the type of complaints Collective Plaintiffs seek to enjoin Defendants from pursuing. This part of CADA's enforcement scheme highlights the fact that the grant of Collective Plaintiffs' preliminary injunction motions against Defendants "would not cure the dilemma that [Collective Plaintiffs] describe." ECF No. 54 at 82:18-83:5. Thus, the Recommendation appropriately considers this threshold issue before reaching the merits of the case.

Finally, Collective Plaintiffs contend the Recommendation incorrectly applied the heightened "clear showing" standard in its analysis. *Committee of Five*, ECF No. 95 at 11; *Doxa,* ECF No. 57 at 11. Relying on *Peck*, Collective Plaintiffs argue that standing requirements should be applied "leniently" in First Amendment cases.  (citing *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022)). Collective Plaintiffs fail to address the rest of the Tenth Circuit's statement—"the First Amendment context creates unique interests that lead us to apply the standing requirements *somewhat more leniently*, facilitating pre-enforcement suits." *Peck*, 43 F. 4th at 1129 (emphasis added). The Tenth Circuit goes on to explain that a plaintiff bringing a First Amendment claim can prove

standing by: (1) "alleging an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a *credible threat of prosecution* thereunder" or (2) "alleging a *credible threat of future prosecution* plus an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights." *Id.* (emphases added). This does not contradict the Recommendation's application of the "clear showing" standard. *See Murthy*, 603 U.S. at 58 ("At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing."). Further, Collective Plaintiffs concede in their objections that "[p]recedent requires only a *clear showing* that the Bookstore is *likely* to establish a credible threat of enforcement." *Committee of Five*, ECF. No. 95 at 11; *Doxa*, ECF No. 57 at 11 (first emphasis added). Thus, Collective Plaintiffs admit the Recommendation was correct in applying the "clear showing" standard. However, Collective Plaintiffs insinuate that, because this "is not supposed to be a difficult bar for plaintiffs to clear," they must have surpassed it. *Committee of Five*, ECF. No. 95 at 11; *Doxa*, ECF No. 57 at 11 (citing *Chiles v. Salazar*, 116 F.4th 1178, 1198 (10th Cir. 2024)). The dispute lies in the result of the analysis, which the Court turns to next.

### B. Credible Threat of Enforcement

Collective Plaintiffs assert they have standing, because they each face a credible threat of enforcement. *Committee of Five*, ECF No. 95 at 11; *Doxa*, ECF No. 57 at 11. Preliminarily, Plaintiff alleges the Recommendation disregards Tenth Circuit precedent where plaintiffs were found to have standing even with past enforcement of a statute. *Committee of Five*, ECF No. 95 at 11; *Doxa*, ECF No. 57 at 11 (citing *303 Creative LLC*

*v. Elenis*, 6 F.4th 1160, 1173 (10th Cir. 2021), *rev'd*, 600 U.S. 570 (2023); *Chiles*, 116 F.4th at 1198). Although Plaintiff does not discuss how this precedent applies to the instant case, the Court finds them distinguishable.

Shortly before entering this Order on March 31, 2026, the Supreme Court issued its opinion on *Chiles*, reversing the Tenth Circuit's judgment. *Chiles v. Salazar*, No. 24-539, 2026 WL 872307 (U.S. Mar. 31, 2026). The Supreme Court agreed with both the district court and the Tenth Circuit determination that "Ms. Chiles had Article III standing to pursue her as-applied pre-enforcement challenge." *Id.* at *5. "Ms. Chiles had alleged a 'credible threat' that the State would enforce its law against her if she continued speaking as she had in the past and wished to do in the future." *Id.* Additionally, "both courts observed, Colorado authorities had refused to disavow bringing enforcement actions against her." *Id.* The circumstances in this case are different.[2] As described above, Collective Plaintiffs' intended conduct—to refer to individuals using pronouns, honorifics, or titles that are consistent with that person's biological sex—in and of itself does not violate CADA's public accommodations statute. The plain language of the statute requires denial of "the full and equal enjoyment of the goods [or] services" of each public accommodation. Colo. Rev. Stat. § 24-34-601. Collective Plaintiffs have not alleged such denial of goods or services. In fact, Born Again Used Book states it will "happily sell its products to anyone." Therefore, Collective Plaintiffs' intended conduct does not appear on its face to violate CADA or present a credible threat of enforcement. And, for the

---

[2] The Court also notes that the *303 Creative* is distinguishable, because it was decided at the summary judgment stage on the merits. *303 Creative LLC*, 6 F.4th at 1190, The instant case has not yet reached the merits.

reasons stated below, Collective Plaintiffs have failed to demonstrate the elements of credible threat of enforcement to justify pre-enforcement injunctive relief.

### 1. Disavowal of Future Enforcement

Collective Plaintiffs reject the Recommendation's finding that Director Sullivan's testimony "operates like a disavowal." *Committee of Five*, ECF No. 95 at 12; *Doxa*, ECF No. 57 at 12. Collective Plaintiffs suggest that, because it declines to use pronouns in *every* situation, it "risks violating Colorado's supposedly fact-intensive and obscure inquiry." *Committee of Five*, ECF No. 95 at 12; *Doxa*, ECF No. 57 at 12. Relying on *Scott v. Allen*, they contend that "Colorado's claim that enforcement under CADA depends on the facts just confirms the enforcement threat." *Committee of Five*, ECF No. 95 at 13; *Doxa*, ECF No. 57 at 13. But in *Scott v. Allen*, "at least one professional association believe[d] that Scott violated the statute, and the District Attorney himself refuse[d] to disavow that Scott's intended actions do not fall under the statute." 153 F.4th 1088, 1097 (10th Cir. 2025). Additionally, the District Attorney did not disavow the possibility of a future prosecution. *Id.*

Here, the specific facts at issue are important. Again, Collective Plaintiffs have represented they will not deny their goods or services to anyone. Therefore, there is no violation of the statute on its face. Further, while Collective Plaintiffs eschew the Division's explanation of the process it uses to determine whether a prosecution under this statute would be pursued, such explanation sheds light on the likelihood of prosecution and the credible threat of prosecution—an issue on which Collective Plaintiffs bear the burden. According to the Director, a CADA violation would have to satisfy three steps: (1) "the

18

public accommodation must intentionally treat a customer or prospective customer differently based on their protected class status"; (2) "the customer must, as a subjective matter, experience the conduct at issue to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation because of the customer's gender identity;" and (3) "the Division would have to determine that a reasonable person, under the circumstances, would experience the conduct to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on their gender identity." *Committee of Five*, ECF No. 84-1 at 7; *Doxa*, ECF No. 46-1 at 7. Defendants have provided sworn declarations, deposition testimony, and discovery responses explaining that Collective Plaintiffs' intended misgendering and deadnaming alone is not conduct that violates CADA *per se*—the conduct must rise to the level of harassment to be a violation. *Doxa*, ECF No. 59 at 7-8; *see Doxa*, ECF No. 46-1 at 8 (Defendants' interrogatory response describing conduct that would violate CADA: "Without any facts regarding the circumstances surrounding the hypothetical complained conduct, the most comparative conduct described by the interrogatory would be harassment."). The Division has not received any complaints against a place of public accommodation regarding its policy or publication on misgendering or deadnaming. *Committee of Five*, ECF No. 84-1 at 555; *Doxa*, ECF No. 46-1 at 555. Even if a member of the public were to file a complaint, it would ultimately be up to the Division to determine whether an enforcement action would proceed. Again, the Director has provided evidence that such an action would not be taken under the

19

circumstances presented by Collective Plaintiffs. While it is true the Defendants have not completely disavowed any possible prosecution of Collective Plaintiffs under any circumstances, this is not required. Rather Collective Plaintiffs must demonstrate a credible threat of prosecution. has At this stage, they have not offered a reasonable basis to infer they face a credible threat of prosecution—which, again, is their burden. Thus, the Court agrees with the Recommendation on this factor.

### 2. Past Enforcement Against the Same Conduct

Plaintiff contends that "[e]nforcing CADA against similar speech is enough" to satisfy the second credible threat of enforcement. *Committee of Five*, ECF No. 95 at 13; *Doxa*, ECF No. 57 at 13. Collective Plaintiffs offer two examples where the Division found probable cause "based solely on misgendering." *Committee of Five*, ECF No. 95 at 13-14; *Doxa*, ECF No. 57 at 13-14. According to Collective Plaintiffs, these examples and the fact that they challenge "a newly enacted law" is enough to prove this factor.

Defendants clarify that the examples introduced by Collective Plaintiffs were circumstances in which there was "a denial of full and equal enjoyment of goods and services." *Committee of Five*, ECF No. 97 at 10; *Doxa*, ECF No. 59 at 10. The first example involved a complainant utilizing the respondent's services to donate blood. *Doxa*, ECF No. 47 at 142. The complainant identified as "male" when creating a donor profile but completed her transition from male to female over a decade later. *Id.* After her transition, the complainant sought the respondent's blood donation services and filled out a new profile, self identifying as "female." *Id.* at 143. The respondent merged the accounts but "refused to change the [c]omplainant's gender to female in the system." *Id.* In the

20

second example, the charging party and her friend were patrons of the respondent, a cocktail lounge. *Id.* at 23. The charging party, who identifies as female/transgender, and her friend went to the women's bathroom. *Id.* at 22-23. When they exited the bathroom, an off-duty police officer employed by the respondent was waiting to speak with them. *Id.* at 23-24. The officer "told her if they were going to use the women's bathroom again then they were not permitted to re-enter the establishment. *Id.* at 24.

As described above, a violation of CADA requires a denial of the full and equal enjoyment of the goods or services offered by the public accommodation because of the individual's gender identity. In the blood bank case, the complainant "was not provided equal treatment to donors outside her protected class, because she was not allowed to self-identify her gender in her donor profile." *Id.* at 143. In the other example, the complainant was told if she and her friend were "going to use the women's bathroom again then they were not permitted to re-enter the establishment." *Id.* at 24. In both cases, the complainants were denied the services of the public accommodations because of their gender identity.

Collective Plaintiffs have expressed that they intend to offer their goods or services to everyone. Additionally, *Darren Patterson Christian Academy* and *St. Mary* do not involve the conduct of misnaming and deadnaming. *Darren Patterson Christian Academy*, 699 F.Supp.3d at 1173 (addressing the non-discrimination rules of the "Universal Preschool Program" as applied to hiring ministers); *see also St. Mary Cath. Par. in Littleton v. Roy*, 736 F. Supp. 3d 956 (D. Colo. 2024) (also addressing the "Universal

21

Preschool Program). Thus, Collective Plaintiffs have not satisfied their burden of demonstrating past enforcement against the same conduct.

### 3.  Authority to Initiate Charges

Collective Plaintiffs also object to the Recommendation's conclusion that an individual's ability to file a charge against them weighs against a clear threat of enforcement. *Committee of Five*, ECF No. 95 at 15; *Doxa*, ECF No. 57 at 15. Collective Plaintiffs rely on *303 Creative*, arguing that CADA's complaint process itself creates a credible threat of enforcement. *Id.* Indeed, the Supreme Court stated that "anyone in the State may file a complaint . . . and initiate a potentially burdensome administrative hearing process." *303 Creative*, 600 U.S. at 583. However, *303 Creative* did not describe the weight of each factor in the clear threat of enforcement analysis. In this case, Magistrate Judge Braswell clearly explained that the weight of the other two factors are sufficient to find that Collective Plaintiffs have not demonstrated they face a credible threat of enforcement. *Doxa*, ECF No. 54 at 90:21-25. Collective Plaintiffs do not dispute this.

Thus, the Court finds that Collective Plaintiffs have not met their burden in proving clear threat of enforcement to establish standing.

### C.  Remaining Preliminary Injunction Factors

Finally, Collective Plaintiffs object to the Recommendation's finding that the remaining preliminary injunction factors weigh against preliminary relief. *Committee of Five*, ECF No. 95 at 15-16; *Doxa*, ECF No. 57 at 15-16. Collective Plaintiffs asserts that (1) their injuries are irreparable because they face a credible threat of enforcement by Colorado and (2) "it is always in the public interest to prevent the violation of a party's

22

constitutional rights." *Committee of Five*, ECF No. 95 at 16; *Doxa*, ECF No. 57 at 16. (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)). As described above, Collective Plaintiffs have not demonstrated a credible threat of enforcement. They also fail to provide evidence of a single complaint or history of enforcement tied to the conduct at issue. Therefore, Collective Plaintiffs have not demonstrated irreparable harm. And, while the Court agrees the public has an interest in protecting an individual's constitutional rights, this alone cannot overcome Collective Plaintiffs' failure to satisfy their burden of demonstrating that the extraordinary relief of pre-enforcement injunction is appropriate.

Accordingly, the Court agrees with the Recommendation and finds that Collective Plaintiffs have not carried their burden to demonstrate pre-enforcement injunctive relief is appropriate. Therefore, their requests for preliminary injunction are denied. The Court notes that, at this stage, it has not reached the merits of these cases. The motions to dismiss (*Committee of Five*, ECF Nos. 69, 70; *Defending Education*, ECF Nos. 81, 82; *Doxa*, ECF Nos. 33, 34) are fully briefed and the Court orders the parties to set a status conference with Magistrate Judge Braswell as soon as possible to address the motions to dismiss and the relief requested thereunder.

## V.    CONCLUSION

For the reasons set forth above, the Court ORDERS:

1. Collective Plaintiffs' Objections to the Recommendation (*Defending Education*, ECF No. 110; *Committee of Five*, ECF No. 95; *Doxa*, ECF No. 57) are OVERRULED;

2.  The Recommendation (*Defending Education*, ECF No. 102; *Committee of Five*,

    ECF No. 87; *Doxa*, ECF No. 49) is ACCEPTED AND ADOPTED;

3.  Collective Plaintiffs' Motions for Preliminary Injunction (*Defending Education*,

    ECF No. 27; *Committee of Five*, ECF No. 15; *Doxa*, ECF No. 4) are DENIED;

    and

4.  The parties are ORDERED to set a status conference with Magistrate Judge

    Braswell to address the pending motions to dismiss (*Defending Education*, ECF

    Nos. 81, 82; *Committee of Five*, ECF Nos. 69, 70; *Doxa*, ECF Nos. 33, 34) and

    the relief requested thereunder.

DATED:  March 31, 2026

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge

24